# WHEAT *v.* UNITED STATES

No. 87–4.   Argued March 2, 1988—Decided May 23, 1988

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 165. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 172.

*John J. Cleary* argued the cause and filed briefs for petitioner.

*Michael K. Kellogg* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson,* and *Louis M. Fischer.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The issue in this case is whether the District Court erred in declining petitioner's waiver of his right to conflict-free counsel and by refusing to permit petitioner's proposed substitution of attorneys.

I

Petitioner Mark Wheat, along with numerous codefendants, was charged with participating in a far-flung drug distribution conspiracy. Over a period of several years, many thousands of pounds of marijuana were transported from Mexico and other locations to southern California. Petitioner acted primarily as an intermediary in the distribution ring; he received and stored large shipments of marijuana at his home, then distributed the marijuana to customers in the region.

Also charged in the conspiracy were Juvenal Gomez-Barajas and Javier Bravo, who were represented in their criminal proceedings by attorney Eugene Iredale. Gomez-Barajas was tried first and was acquitted on drug charges overlapping with those against petitioner. To avoid a second trial on other charges, however, Gomez-Barajas offered to plead guilty to tax evasion and illegal importation of merchandise. At the commencement of petitioner's trial, the District Court had not accepted the plea; Gomez-Barajas was thus free to withdraw his guilty plea and proceed to trial.

Bravo, evidently a lesser player in the conspiracy, decided to forgo trial and plead guilty to one count of transporting approximately 2,400 pounds of marijuana from Los Angeles to a residence controlled by Victor Vidal. At the conclusion of Bravo's guilty plea proceedings on August 22, 1985, Iredale notified the District Court that he had been contacted by petitioner and had been asked to try petitioner's case as well. In response, the Government registered substantial concern about the possibility of conflict in the representation. After entertaining some initial discussion of the substitution of counsel, the District Court instructed the parties to present more detailed arguments the following Monday, just one day before the scheduled start of petitioner's trial.

At the Monday hearing, the Government objected to petitioner's proposed substitution on the ground that Iredale's representation of Gomez-Barajas and Bravo created a serious conflict of interest. The Government's position was premised on two possible conflicts. First, the District Court had not yet accepted the plea and sentencing arrangement negotiated between Gomez-Barajas and the Government; in the event that arrangement were rejected by the court, Gomez-Barajas would be free to withdraw the plea and stand trial. He would then be faced with the prospect of representation by Iredale, who in the meantime would have acted as petitioner's attorney. Petitioner, through his participation in the drug distribution scheme, was familiar with the sources

and size of Gomez-Barajas' income, and was thus likely to be called as a witness for the Government at any subsequent trial of Gomez-Barajas. This scenario would pose a conflict of interest for Iredale, who would be prevented from cross-examining petitioner and thereby from effectively representing Gomez-Barajas.

Second, and of more immediate concern, Iredale's representation of Bravo would directly affect his ability to act as counsel for petitioner. The Government believed that a portion of the marijuana delivered by Bravo to Vidal's residence eventually was transferred to petitioner. In this regard, the Government contacted Iredale and asked that Bravo be made available as a witness to testify against petitioner, and agreed in exchange to modify its position at the time of Bravo's sentencing. In the likely event that Bravo were called to testify, Iredale's position in representing both men would become untenable, for ethical proscriptions would forbid him to cross-examine Bravo in any meaningful way. By failing to do so, he would also fail to provide petitioner with effective assistance of counsel. Thus, because of Iredale's prior representation of Gomez-Barajas and Bravo and the potential for serious conflict of interest, the Government urged the District Court to reject the substitution of attorneys.

In response, petitioner emphasized his right to have counsel of his own choosing and the willingness of Gomez-Barajas, Bravo, and petitioner to waive the right to conflict-free counsel. Petitioner argued that the circumstances posited by the Government that would create a conflict for Iredale were highly speculative and bore no connection to the true relationship between the co-conspirators. If called to testify, Bravo would simply say that he did not know petitioner and had no dealings with him; no attempt by Iredale to impeach Bravo would be necessary. Further, in the unlikely event that Gomez-Barajas went to trial on the charges of tax evasion and illegal importation, petitioner's lack of involvement

in those alleged crimes made his appearance as a witness highly improbable. Finally, and most importantly, all three defendants agreed to allow Iredale to represent petitioner and to waive any future claims of conflict of interest. In petitioner's view, the Government was manufacturing implausible conflicts in an attempt to disqualify Iredale, who had already proved extremely effective in representing Gomez-Barajas and Bravo.

After hearing argument from each side, the District Court noted that it was unfortunate that petitioner had not suggested the substitution sooner, rather than two court days before the commencement of trial. The court then ruled:

> "[B]ased upon the representation of the Government in [its] memorandum that the Court really has no choice at this point other than to find that an irreconcilable conflict of interest exists. I don't think it can be waived, and accordingly, Mr. Wheat's request to substitute Mr. Iredale in as attorney of record is denied." App. 100–101.

Petitioner proceeded to trial with his original counsel and was convicted of conspiracy to possess more than 1,000 pounds of marijuana with intent to distribute, in violation of 21 U. S. C. § 846, and five counts of possessing marijuana with intent to distribute, in violation of § 841(a)(1).

The Court of Appeals for the Ninth Circuit affirmed petitioner's convictions, 813 F. 2d 1399 (1987), finding that, within the limits prescribed by the Sixth Amendment, the District Court has considerable discretion in allowing substitution of counsel. The Court of Appeals found that the District Court had correctly balanced two Sixth Amendment rights: (1) the qualified right to be represented by counsel of one's choice, and (2) the right to a defense conducted by an attorney who is free of conflicts of interest. Denial of either of these rights threatened the District Court with an appeal assigning the ruling as reversible error, and the Court of Appeals concluded that the District Court did not abuse its dis-

cretion in declining to allow the substitution or addition of Iredale as trial counsel for petitioner.[1]

Because the Courts of Appeals have expressed substantial disagreement about when a district court may override a defendant's waiver of his attorney's conflict of interest,[2] we granted certiorari, 484 U. S. 814 (1987).

## II

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In *United States* v. *Morrison*, 449 U. S. 361, 364 (1981), we observed that this right was designed to assure fairness in the adversary criminal process. Realizing that an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system, *Powell* v. *Alabama*, 287 U. S. 45, 69 (1932); *United States* v. *Ash*, 413 U. S. 300, 307 (1973), we have held that the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime. *Gideon* v. *Wainwright*,

---

[1] The Court of Appeals also found that petitioner was not prejudiced by a conference the District Court held with counsel in petitioner's absence, and that petitioner had no right to insist upon a plea bargain from the Government. Our grant of certiorari, however, was limited to the issue addressed in the text of this opinion, and we do not reach the other rulings made by the Court of Appeals.

[2] See, *e. g., In re Paradyne Corp.*, 803 F. 2d 604, 611, n. 16 (CA11 1986) (the right of counsel "does not override the broader societal interests in the effective administration of justice . . . or in the maintenance of 'public confidence in the integrity of our legal system'") (citation omitted); *In re Grand Jury Subpoena Served Upon Doe*, 781 F. 2d 238, 250–251 (CA2), cert. denied *sub nom. Roe* v. *United States*, 475 U. S. 1108 (1986) ("[C]ourts have the power and duty to disqualify counsel where the public interest in maintaining the integrity of the judicial system outweighs the accused's constitutional right"); *United States* v. *Reese*, 699 F. 2d 803, 805 (CA6 1983) (a trial court should override a defendant's knowing waiver only in "compelling circumstances"); *United States* v. *Flanagan*, 679 F. 2d 1072, 1076 (CA3 1982) (a trial court may refuse a waiver when an actual conflict is "very likely"), rev'd on other grounds, 465 U. S. 259 (1984).

372 U. S. 335 (1963). We have further recognized that the purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland* v. *Washington,* 466 U. S. 668, 689 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States* v. *Cronic,* 466 U. S. 648, 657, n. 21 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. See *Morris* v. *Slappy,* 461 U. S. 1, 13–14 (1983); *Jones* v. *Barnes,* 463 U. S. 745 (1983).

The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court.[3] Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government. The question raised in this case is the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy.

In previous cases, we have recognized that multiple representation of criminal defendants engenders special dangers of which a court must be aware. While "permitting a single at-

---

[3] Our holding in *Faretta* v. *California,* 422 U. S. 806 (1975), that a criminal defendant has a Sixth Amendment right to represent *himself* if he voluntarily elects to do so, does not encompass the right to choose any advocate if the defendant wishes to be represented by counsel.

torney to represent codefendants . . . is not *per se* violative of constitutional guarantees of effective assistance of counsel," *Holloway* v. *Arkansas*, 435 U. S. 475, 482 (1978), a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel. See also *Cuyler* v. *Sullivan*, 446 U. S. 335 (1980). As we said in *Holloway:*

> "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. . . . [A] conflict may . . . prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another." 435 U. S., at 489–490.

Petitioner insists that the provision of waivers by all affected defendants cures any problems created by the multiple representation. But no such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice. Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. Both the American Bar Association's Model Code of Professional Responsibility and its Model Rules of Professional Conduct, as well as the rules of the California Bar Association (which governed the attorneys in this case), impose limitations on multiple representation of clients. See ABA Model Code of Professional Responsibility DR5–105(C) (1980); ABA Model Rules of Professional Conduct, Rule 1.7 (1984); Rules of Professional Conduct of the State Bar of California, Rules 5 and 7, Cal. Bus. & Prof. Code Ann. § 6076 (West 1974). Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

For this reason, the Federal Rules of Criminal Procedure direct trial judges to investigate specially cases involving joint representation. In pertinent part, Rule 44(c) provides:

> "[T]he court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

Although Rule 44(c) does not specify what particular measures may be taken by a district court, one option suggested by the Notes of the Advisory Committee is an order by the court that the defendants be separately represented in subsequent proceedings in the case. 18 U. S. C. App., p. 650. This suggestion comports with our instructions in *Holloway* and in *Glasser* v. *United States*, 315 U. S. 60 (1942), that the trial courts, when alerted by objection from one of the parties, have an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment.

To be sure, this need to investigate potential conflicts arises in part from the legitimate wish of district courts that their judgments remain intact on appeal. As the Court of Appeals accurately pointed out, trial courts confronted with multiple representations face the prospect of being "whipsawed" by assertions of error no matter which way they rule. If a district court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. See, *e. g.*, *Burger* v. *Kemp*, 483 U. S. 776 (1987). On the other hand, a district court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case. Nor does a waiver by the defendant

necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of Courts of Appeals to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel. See, *e. g.*, *United States ex rel. Tonaldi* v. *Elrod*, 716 F. 2d 431, 436–437 (CA7 1983); *United States* v. *Vowteras*, 500 F. 2d 1210, 1211 (CA2), cert. denied, 419 U. S. 1069 (1974); see also *Glasser*, *supra*, at 70 ("To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights").

Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented. As the Court of Appeals for the Third Circuit stated in *United States* v. *Dolan*, 570 F. 2d 1177, 1184 (1978):

> "[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver."

Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict,

even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses. In the circumstances of this case, with the motion for substitution of counsel made so close to the time of trial, the District Court relied on instinct and judgment based on experience in making its decision. We do not think it can be said that the court exceeded the broad latitude which must be accorded it in making this decision. Petitioner of course rightly points out that the Government may seek to "manufacture" a conflict in order to prevent a defendant from having a particularly able defense counsel at his side; but trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision.

Here the District Court was confronted not simply with an attorney who wished to represent two coequal defendants in a straightforward criminal prosecution; rather, Iredale proposed to defend three conspirators of varying stature in

a complex drug distribution scheme. The Government intended to call Bravo as a witness for the prosecution at petitioner's trial.[4] The Government might readily have tied certain deliveries of marijuana by Bravo to petitioner, necessitating vigorous cross-examination of Bravo by petitioner's counsel. Iredale, because of his prior representation of Bravo, would have been unable ethically to provide that cross-examination.

Iredale had also represented Gomez-Barajas, one of the alleged kingpins of the distribution ring, and had succeeded in obtaining a verdict of acquittal for him. Gomez-Barajas had agreed with the Government to plead guilty to other charges, but the District Court had not yet accepted the plea arrangement. If the agreement were rejected, petitioner's probable testimony at the resulting trial of Gomez-Barajas would create an ethical dilemma for Iredale from which one or the other of his clients would likely suffer.

Viewing the situation as it did before trial, we hold that the District Court's refusal to permit the substitution of counsel in this case was within its discretion and did not violate petitioner's Sixth Amendment rights. Other district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was "right" and the other "wrong." The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

The judgment of the Court of Appeals is accordingly

*Affirmed.*

---

[4] Bravo was in fact called as a witness at petitioner's trial. See Tr. 728 *et seq.* His testimony was elicited to demonstrate the transportation of drugs that the prosecution hoped to link to petitioner.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

This Court today concludes that the District Court did not commit reversible error by denying the motion of petitioner Mark Wheat to add or substitute counsel of his choice. In the course of discussing the District Court's ruling, the Court sets forth several principles with which I agree. The Court acknowledges, as it must, that the Sixth Amendment's guarantee of assistance of counsel comprehends the right to select one's own attorney. The Court also states that, although this constitutional right is not absolute, it mandates a presumption in favor of accepting a criminal defendant's choice of counsel. Having articulated these principles, however, the Court unaccountably grants broad discretion to the trial court to decide whether this presumption has been overcome. As a consequence of this unwarranted deference to a trial court's decision respecting a constitutional right, the Court countenances a ruling that is patently incorrect. Because I believe that the potential for a conflict of interest in this case did not overcome petitioner's right to choose his own counsel, I dissent.

This Court long has recognized, and today reaffirms, that the Sixth Amendment provides protection for a criminal defendant's choice of counsel. More than 50 years ago, we stated that "[i]t is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell* v. *Alabama*, 287 U. S. 45, 53 (1932). This Court has reiterated this principle on frequent occasions. See, *e. g.*, *Chandler* v. *Fretag*, 348 U. S. 3, 9 (1954); *Glasser* v. *United States*, 315 U. S. 60, 70 (1942). Our statements on this score stem largely from an appreciation that a primary purpose of the Sixth Amendment is to grant a criminal defendant effective control over the conduct of his defense. As this Court previously has stated, the Sixth Amendment "grants to the accused personally the right to make his defense," because

"it is he who suffers the consequences if the defense fails." *Faretta* v. *California*, 422 U. S. 806, 819–820 (1975). An obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative. In addition, lodging the selection of counsel with the defendant generally will promote the fairness and integrity of criminal trials.

The right to counsel of choice, as the Court notes, is not absolute. When a defendant's selection of counsel, under the particular facts and circumstances of a case, gravely imperils the prospect of a fair trial, a trial court may justifiably refuse to accede to the choice. Thus, a trial court may in certain situations reject a defendant's choice of counsel on the ground of a potential conflict of interest, because a serious conflict may indeed destroy the integrity of the trial process. As the Court states, however, the trial court must recognize a presumption in favor of a defendant's counsel of choice. This presumption means that a trial court may not reject a defendant's chosen counsel on the ground of a potential conflict of interest absent a showing that both the likelihood and the dimensions of the feared conflict are substantial.[1] Unsupported or dubious speculation as to a conflict will not suffice. The Government must show a substantial potential for the kind of conflict that would undermine the fairness of the trial process. In these respects, I do not believe my position differs significantly, if at all, from that expressed in the opinion of the Court. See *ante*, at 161–162, 164.

I do disagree, however, with the Court's suggestion that the trial court's decision as to whether a potential conflict justifies rejection of a defendant's chosen counsel is entitled to some kind of special deference on appeal. The Court grants trial courts "broad latitude" over the decision to accept or re-

---

[1] In stating this principle, I mean to address only cases in which all parties to the potential conflict have made a fully informed waiver of their right to conflict-free representation. It is undisputed in this case that petitioner, as well as Juvenal Gomez-Barajas and Javier Bravo, had agreed to waive this right.

ject a defendant's choice of counsel, *ante*, at 163; although never explicitly endorsing a standard of appellate review, the Court appears to limit such review to determining whether an abuse of discretion has occurred, see *ante*, at 164. This approach, which the Court supports solely by noting the difficulty of evaluating the likelihood and magnitude of a conflict, accords neither with the nature of the trial court's decision nor with the importance of the interest at stake.

The trial court's decision as to whether the circumstances of a given case constitute grounds for rejecting a defendant's chosen counsel—that is, as to whether these circumstances present a substantial potential for a serious conflict of interest—is a mixed determination of law and fact. The decision is properly described in this way because it requires and results from the application of a legal standard to the established facts of a case. See, *e. g., Townsend* v. *Sain,* 372 U. S. 293, 309, n. 6 (1963). Appellate courts traditionally do not defer to such determinations. See, *e. g., ibid.; Sumner* v. *Mata,* 455 U. S. 591, 597, and n. 10 (1982). For this reason, the Court in *Cuyler* v. *Sullivan,* 446 U. S. 335 (1980), held that a trial court's determination as to whether an attorney had represented conflicting interests at trial was not entitled to any deference. The determination at issue here, which focuses on the potential for a conflict of interest, is not different in any relevant respect.[2]

---

[2] It is true that a trial court, in making a determination regarding the potential for a conflict of interest, must make a prediction as to future events, which frequently is a difficult task. This aspect of the decision, however, does not call for a lax standard of review. The question on review is whether the trial court was correct in holding that the facts and circumstances apparent *at the time of its decision* demonstrated a substantial potential for a serious conflict of interest. Appellate courts are fully capable of posing and resolving this question. A deferential standard of review therefore is not necessary to generate appellate decisions that take into account and appropriately reflect the uncertainties existing at the time of the trial court's ruling.

The inappropriateness of deferring to this determination becomes even more apparent when its constitutional significance is taken into account. Cf. *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 502–503 (1984) (stating that "[w]hen the standard governing the decision of a particular case is provided by the Constitution," close appellate scrutiny is particularly important). The interest at stake in this kind of decision is nothing less than a criminal defendant's Sixth Amendment right to counsel of his choice. The trial court simply does not have "broad latitude," *ante,* at 163, to vitiate this right. In my view, a trial court that rejects a criminal defendant's chosen counsel on the ground of a potential conflict should make findings on the record to facilitate review, and an appellate court should scrutinize closely the basis for the trial court's decision. Only in this way can a criminal defendant's right to counsel of his choice be appropriately protected.

The Court's resolution of the instant case flows from its deferential approach to the District Court's denial of petitioner's motion to add or substitute counsel; absent deference, a decision upholding the District Court's ruling would be inconceivable. Indeed, I believe that even under the Court's deferential standard, reversal is in order. The mere fact of multiple representation, as the Court concedes, will not support an order preventing a criminal defendant from retaining counsel of his choice. As this Court has stated on prior occasions, such representation will not invariably pose a substantial risk of a serious conflict of interest and thus will not invariably imperil the prospect of a fair trial. See *Cuyler* v. *Sullivan, supra,* at 346–348; *Holloway* v. *Arkansas,* 435 U. S. 475, 482–483 (1978). The propriety of the District Court's order thus depends on whether the Government showed that the particular facts and circumstances of the multiple representation proposed in this case were such as to overcome the presumption in favor of petitioner's choice of counsel. I believe it is clear that the Government failed to

make this showing. Neither Eugene Iredale's representation of Juvenal Gomez-Barajas nor Iredale's representation of Javier Bravo posed any threat of causing a conflict of interest.

At the time of petitioner's trial, Iredale's representation of Gomez-Barajas was effectively completed. As the Court notes, Iredale had obtained an acquittal for Gomez-Barajas on charges relating to a conspiracy to distribute marijuana. Iredale also had negotiated an agreement with the Government under which Gomez-Barajas would plead guilty to charges of tax evasion and illegal importation of merchandise, although the trial court had not yet accepted this plea arrangement. Gomez-Barajas was not scheduled to appear as a witness at petitioner's trial; thus, Iredale's conduct of that trial would not require him to question his former client. The only possible conflict this Court can divine from Iredale's representation of both petitioner and Gomez-Barajas rests on the premise that the trial court would reject the negotiated plea agreement and that Gomez-Barajas then would decide to go to trial. In this event, the Court tells us, "petitioner's probable testimony at the resulting trial of Gomez-Barajas would create an ethical dilemma for Iredale." *Ante*, at 164.

This argument rests on speculation of the most dubious kind. The Court offers no reason to think that the trial court would have rejected Gomez-Barajas' plea agreement; neither did the Government posit any such reason in its argument or brief before this Court. The most likely occurrence at the time petitioner moved to retain Iredale as his defense counsel was that the trial court would accept Gomez-Barajas' plea agreement, as the court in fact later did. Moreover, even if Gomez-Barajas had gone to trial, petitioner probably would not have testified. The record contains no indication that petitioner had any involvement in or information about crimes for which Gomez-Barajas might yet have stood trial. The only alleged connection between petitioner and Gomez-Barajas sprang from the conspiracy to distribute marijuana,

and a jury already had acquitted Gomez-Barajas of that charge. It is therefore disingenuous to say that representation of both petitioner and Gomez-Barajas posed a serious potential for a conflict of interest.

Similarly, Iredale's prior representation of Bravo was not a cause for concern. The Court notes that the prosecution intended to call Bravo to the stand at petitioner's trial and asserts that Bravo's testimony could well have "necessitat[ed] vigorous cross-examination . . . by petitioner's counsel." *Ibid.* The facts, however, belie the claim that Bravo's anticipated testimony created a serious potential for conflict. Contrary to the Court's inference, Bravo could not have testified about petitioner's involvement in the alleged marijuana distribution scheme. As all parties were aware at the time, Bravo did not know and could not identify petitioner; indeed, prior to the commencement of legal proceedings, the two men never had heard of each other. Bravo's eventual testimony at petitioner's trial related to a shipment of marijuana in which petitioner was not involved; the testimony contained not a single reference to petitioner. Petitioner's counsel did not cross-examine Bravo, and neither petitioner's counsel nor the prosecutor mentioned Bravo's testimony in closing argument. All of these developments were predictable when the District Court ruled on petitioner's request that Iredale serve as trial counsel; the contours of Bravo's testimony were clear at that time. Given the insignificance of this testimony to any matter that petitioner's counsel would dispute, the proposed joint representation of petitioner and Bravo did not threaten a conflict of interest.[3]

---

[3] The very insignificance of Bravo's testimony, combined with the timing of the prosecutor's decision to call Bravo as a witness, raises a serious concern that the prosecutor attempted to manufacture a conflict in this case. The prosecutor's decision to use Bravo as a witness was an 11th-hour development. Throughout the course of plea negotiations with Bravo, the prosecutor never had suggested that Bravo testify at petitioner's trial. At Bravo's guilty-plea proceedings, when Iredale notified the District Court of petitioner's substitution motion, the prosecutor conceded

Moreover, even assuming that Bravo's testimony might have "necessitat[ed] vigorous cross-examination," the District Court could have insured against the possibility of any conflict of interest without wholly depriving petitioner of his constitutional right to the counsel of his choice. Petitioner's motion requested that Iredale either be substituted for petitioner's current counsel or be added to petitioner's defense team. Had the District Court allowed the addition of Iredale and then ordered that he take no part in the cross-examination of Bravo, any possibility of a conflict would have been removed. Especially in light of the availability of this precautionary measure, the notion that Iredale's prior representation of Bravo might well have caused a conflict of interest at petitioner's trial is nothing short of ludicrous.[4]

---

that he had made no plans to call Bravo as a witness. Only after the prosecutor learned of the substitution motion and decided to oppose it did he arrange for Bravo's testimony by agreeing to recommend to the trial court a reduction in Bravo's sentence. Especially in light of the scarce value of Bravo's testimony, this prosecutorial behavior very plausibly may be viewed as a maneuver to prevent Iredale from representing petitioner at trial. Iredale had proved to be a formidable adversary; he previously had gained an acquittal for the alleged kingpin of the marijuana distribution scheme. As the District Court stated in considering petitioner's motion: "Were I in [petitioner's] position I'm sure I would want Mr. Iredale representing me, too. He did a fantastic job in that [Gomez-Barajas] trial . . . ." App. 124–125. The prosecutor's decision to call Bravo as a witness may well have stemmed from a concern that Iredale would do an equally fantastic job at petitioner's trial. As the Court notes, governmental maneuvering of this kind is relevant to a trial court's decision as to whether to accept a criminal defendant's chosen counsel. The significant possibility that the prosecutor was engaging in such bad-faith conduct provides yet another reason to dispute the Court's resolution of this case.

[4] The Court somewhat obliquely suggests that the timing of the motion to substitute or add Iredale as trial counsel helps to justify the District Court's ruling. See ante, at 155, 157, 163. I cannot agree. Iredale made clear to the District Court that notwithstanding the proximity of the scheduled trial date, he would neither need nor request a continuance of the trial were he substituted or added as defense counsel. The timing of petitioner's motion is therefore relevant only insofar as it affected the ability of the

The Court gives short shrift to the actual circumstances of this case in upholding the decision below. These circumstances show that the District Court erred in denying petitioner's motion to substitute or add Iredale as defense counsel. The proposed representation did not pose a substantial risk of a serious conflict of interest. The District Court therefore had no authority to deny petitioner's Sixth Amendment right to retain counsel of his choice. This constitutional error demands that petitioner's conviction be reversed. I accordingly dissent.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

This is not the first case in which the Court has demonstrated "its apparent unawareness of the function of the independent lawyer as a guardian of our freedom." *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 371 (1985) (STEVENS, J., dissenting) (footnote omitted). But even under the Court's paternalistic view of the citizen's right to select his or her own lawyer, its analysis of this case is seriously flawed. As JUSTICE MARSHALL demonstrates, the Court exaggerates the significance of the potential conflict. See *ante*, at 168–172. Of greater importance, the Court gives inadequate weight to the informed and voluntary character of the clients' waiver of their right to conflict-free representation. Particularly, the Court virtually ignores the fact that additional counsel representing petitioner had provided him with sound advice concerning the wisdom of a waiver and would have remained available during the trial to assist in the defense. Thus, this is not a case in which the District Judge faced the question whether one counsel should be substituted for another; rather the question before him

District Court to consider the issues that the motion raised. The District Court itself believed that it had sufficient time to consider these issues. Far from denying the motion because of its timing, the District Court issued a decision on the merits after full briefing and oral argument.

was whether petitioner should be permitted to have *additional* counsel of his choice. I agree with JUSTICE MARSHALL that the answer to that question is perfectly clear.

Accordingly, although I agree with the Court's premise that district judges must be afforded wide latitude in passing on motions of this kind,* in this case it is abundantly clear to me that the District Judge abused his discretion and deprived this petitioner of a constitutional right of such fundamental character that reversal is required.

---

*In my view, deference to the trial judge is appropriate in light of his or her greater familiarity with such factors as the ability of the defendant knowingly and voluntarily to waive a potential conflict (including the possibility that a codefendant may be exerting undue influence over the defendant), the character of the lawyers, the particular facts of the case, and the availability of alternative counsel of a like caliber.