STATE OF NORTH CAROLINA v. DONALD FREDERICK TAYLOR

No. COA01-942

(Filed 31 December 2002)

1. Constitutional Law—right to counsel—disqualification of retained counsel—conflict of interest

The trial court did not violate defendant's Sixth Amendment right to counsel in a second-degree murder case by disqualifying defendant's retained counsel based on a conflict of interest, because: (1) defendant's retained counsel was previously retained by the victim as her attorney for a domestic action against her husband; (2) defendant's retained counsel gave notice of his intent to use a power of attorney, prepared by the attorney giving defendant power of attorney over the victim's interests while the attorney was counsel of record for the victim in a domestic case, for the benefit of defendant; (3) the attorney's representation of defendant would inescapably be adverse to the

STATE v. TAYLOR

[155 N.C. App. 251 (2002)]

victim within the meaning of Revised Rule of Professional Conduct 1.7 since defendant was on trial for the victim's murder and the attorney, in defense of defendant for that murder, could be called upon to impeach statements made by the victim during his dual representation; (4) although the attorney was representing defendant in a matter unrelated to his representation of the victim, the attorney had a duty of loyalty and care to the victim which could have been compromised by this dual representation; (5) the attorney was privy to some information regarding the victim's personal life and habits and her state of mind after having represented her for some fifteen months in her divorce proceedings, and this information would be helpful in defending the person accused of her murder; (6) although the attorney was not actually called as a witness to testify, the possibility certainly existed and would have violated Revised Rule of Professional Conduct 3.7; and (7) defendant was not prejudiced when his newly appointed attorney had five months to prepare for trial.

**2. Homicide—second-degree murder—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of second-degree murder even though defendant contends the victim shot herself, because the evidence taken in the light most favorable to the State revealed that: (1) the victim and defendant were the only two persons in the house at the time of the shooting; (2) prior to the shooting, one of the victim's friends overheard defendant threatening to kill the victim if she ever left him; (3) defendant and the victim had an argument just before the victim was shot; and (4) the victim was shot in the back of the neck, and medical analysis indicated it was from a distance that could not have been self-inflicted.

**3. Sentencing—presumptive range—failure to find mitigating factors**

The trial court did not abuse its discretion in a second-degree murder case by sentencing defendant within the statutory presumptive range without making findings in mitigation.

Appeal by defendant from judgment entered 28 March 2000 by Judge Jack A. Thompson in Cumberland County Superior Court. Heard in the Court of Appeals 21 May 2002.

STATE v. TAYLOR

[155 N.C. App. 251 (2002)]

*Attorney General Roy Cooper, by Assistant Attorney General A. Danielle Marquis, for the State.*

*James R. Parish, for defendant.*

BIGGS, Judge.

Donald Frederick Taylor (defendant) appeals his conviction of second-degree murder. For the reasons herein, we find no error.

At trial, the State's evidence tended to show that on 15 July 1998, defendant called a 911 operator to report that his live-in girlfriend, Dorothy Taylor (victim, no relation to defendant), had shot herself. When a paramedic arrived, he observed the victim lying on her back in the kitchen with an apparent gun shot wound to the back of the neck and a substantial amount of blood coming from the wound. A semi-automatic pistol was discovered on the floor beside the victim. Defendant told the paramedic that he and the victim were arguing, that she received a phone call, and, shortly thereafter, shot herself.

When Deputy Marvin Sapp of the Cumberland County Sheriff's Department arrived at the scene, he observed defendant, who seemed extremely calm, coming out of the bathroom drying his hands. Defendant told the deputy that the victim came home from work and laid across the bed while defendant was talking on the phone. Defendant ended the telephone conversation, took a shower, and then left the bedroom to make another phone call. According to defendant, after he finished the second call, the victim dialed *69 on the phone and discovered that defendant had been talking to another woman. The couple then argued. Defendant went back to the bedroom, took his gun from his holster and laid it on the bed as he got ready for work as a security officer. When he turned around, the gun was missing. Shortly thereafter, defendant heard a gun shot and saw the victim fall to the kitchen floor.

The victim was transported by ambulance to Cape Fear Valley Hospital, where it was determined that she had suffered a gunshot wound, with the bullet entering from the left and exiting on the right of her posterior neck. As a result, the victim's spinal cord was bruised beyond recovery, leaving her a quadriplegic. Noting the absence of any markings of burning, stippling, or tattooing, which are typical for close contact gunshot wounds, the treating physician determined that the victim's wound was not a contact wound. The doctor further determined that the victim could not have inflicted this injury on her-

self since she could not possibly have held the gun at a distance to prevent any burning, stippling, or tattooing of any kind.

On 8 August 1998, defendant was charged with felonious assault with a deadly weapon with intent to kill inflicting serious injury. As a result of complications from the gunshot wound, the victim died on 2 February 1999; on the same day defendant was charged with second-degree murder.

Prior to trial, the State moved to disqualify defendant's attorney, James Walen, from representing defendant contending that a conflict of interest existed since Walen had previously represented the victim in a divorce action. Hearings were conducted based on the State's motion on 24 and 26 October 2000. The court order, entered 19 January 2001, concluded that there was an "actual and substantial" conflict of interest and disqualified Walen and all members of his firm from representing defendant. The court appointed another attorney to represent defendant.

On 28 March 2001, defendant was convicted of second-degree murder and sentenced to a minimum term of 141 months and a maximum term of 179 months in prison. From this conviction, defendant appeals.

I.

[1] By his first assignment of error, defendant argues that the trial court violated his constitutional right to counsel by disqualifying his retained counsel. We disagree.

The Sixth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment and §§ 19 and 23 of the North Carolina Constitution guarantees a defendant's right to counsel in a criminal prosecution. *State v. Shores*, 102 N.C. App. 473, 402 S.E.2d 162 (1991). This right includes the right to retain an attorney of the defendant's choice. *State v. Yelton*, 87 N.C. App. 554, 361 S.E.2d 753 (1987). However, this right is not absolute. "The essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to insure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140 (1987). As noted by this Court in *State v. Shores*, 102 N.C. App. at 475, 402 S.E.2d at 163 (quoting *Id.* at 160, 100 L. Ed. 2d 140), "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards. . . ." In this

regard, the right of a defendant to have an attorney of his own choosing must be balanced against the court's interest of conducting a fair and unbiased legal proceeding. *State v. Bruton*, 344 N.C. 381, 474 S.E.2d 336 (1996).

When a party challenges an attorney's representation contending that a conflict of interest exists, "a hearing should be conducted, 'to determine whether there exists such a conflict of interest that the defendant will be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the sixth amendment.'" *State v. James*, 111 N.C. App. 785, 791, 433 S.E.2d S.E.2d 755, 758 (1993) (quoting *U.S. v. Cataldo*, 625 F. Supp. 1255, 1257 (S.D.N.Y. 1985) (citation omitted)). If it is shown that "an actual conflict or the potential for conflict exists, the presumption in favor of an accused's counsel of choice will be overcome." *Shores*, 102 N.C. App. at 475, 402 S.E.2d at 163.

It is well settled that "[t]he trial court must be given substantial latitude in granting or denying a motion for attorney disqualification." *Id.* To that end, the findings of the trial court are binding upon appeal if they are supported by any competent evidence, and the court's ruling may be disturbed only where there is a manifest abuse of discretion or if it is based on an error of law. *State v. Hardison*, 143 N.C. App. 114, 545 S.E.2d 233 (2001).

In the case *sub judice*, hearings were conducted on the State's motion that Walen be disqualified due to conflict of interest. After extensive discussion with and questioning of counsel for defendant and the State, as well as briefing the issue by both parties, the trial court made the following pertinent findings:

4. Dorothy Taylor, [the victim], retained James M. Walen as her attorney for a domestic action against her husband, Jeffrey Taylor [Taylor]. Pursuant to that representation, Mr. Walen filed a Complaint for divorce in 97 CVD 5481 on July 25, 1997. According to Donald Taylor, [defendant], he and the victim were involved in a relationship and had been living together for about one year as of the date of the shooting, July 15, 1998.

5. Mr. Walen filed a Motion for Summary Judgment on September 8, 1997. On September 16, 1997, Mr. Walen filed an Amended Complaint for divorce and sought to have a separation agreement incorporated into the divorce judgment. On September 29, 1997, Mr. Walen obtained a Judgment of Divorce by Order of Summary

Judgment in which the court incorporated the separation agreement into the judgment.

6. On October 14, 1997, Mr. Walen filed a Motion in the Cause for the court to determine why Taylor should not be held in contempt for failing to comply with the terms of the Judgment of Divorce. The matter was heard on November 20, 1997, and the court granted the victim relief by Order filed on December 4, 1997.

7. On April 23, 1998, Mr. Walen filed another Motion in the Cause to again determine why Taylor should not be held in contempt for failing to comply with the terms of the Judgment of Divorce. The matter was heard on June 29, 1998, and the court granted the victim relief by Order filed on July 13, 1998.

8. On July 15, 1998, the State's evidence tends to show that the Defendant shot the victim in the neck resulting initially with high cervical quadriplegia but ultimately resulting in her death on February 2, 1999.

9. The victim made statements regarding the events of the shooting. The State has given Notice of its intent to use certain statements in the trial of this matter under the residual hearsay exception to the hearsay rule. Further, on July 15, 1998, Detectives Ed Brincefield and Jo Autry spoke with the victim as she was in the initial stages of treatment at Cape Fear Valley Medical Center. This was the victim's first known statement following the shooting. According to one of the victim's treating physicians, Dr. Mark Hnilica, her injury was certainly life threatening. She communicated to Detectives Brincefield and Autry that she had not shot herself but rather her husband, the man at the house had shot her. She has made other statements, some of which indicate that the defendant did not shoot her, some of which indicate that he did, and some of which reveal that she could not remember what had happened. She has consistently stated, however, that she did not shoot herself. Only two people were present at the time of the shooting, the victim and the defendant.

10. The defendant was arrested on August 8, 1998. On or about August 18, 1998, as the victim lay immobile in her hospital bed, Mr. Walen prepared a Power of Attorney for the victim to give power of attorney to the defendant. A member of Mr. Walen's staff proceeded to the hospital whereupon the victim executed the document. Mr. Walen has given Notice to the State that he intends

to use at trial certain hearsay statements of the victim. His Notice includes the August 18, 1998 Power of Attorney given to the Defendant by the victim. This evidence is relevant to show that the Defendant did not shoot the victim for if he had, the victim would not have given her power of attorney to him. According to a statement made by the victim to her sister on August 19, 1998, however, she (the victim) was "so drugged up" when the document was executed that she did not know what she had done. This information was provided to Detective O'Briant on August 25, 1998.

11. On September 9, 1998, Mr. Walen filed a Motion to Withdraw as the victim's attorney in 97 CVD 5481. On October 9, 1998, the court allowed Mr. Walen's motion to withdraw. The domestic case continued as Taylor through counsel filed a Motion and Amended Motion to set aside the divorce judgment and for a preliminary injunction on the grounds that he and the victim were never married.

. . . .

13. There is a substantial likelihood that the following will occur at the trial of this case: The State [] will introduce into evidence statements made by the victim which implicate the Defendant as the perpetrator of the charged offense. The Defendant must attempt to impeach the victim's statements. The Defendant will also attempt to use statements made by the victim which tend to exculpate the Defendant. The Defendant will also attempt to use the above-described power of attorney in his defense. The State will then attempt to negate the meaning of the power of attorney with subsequent statements of the victim concerning the execution of the document, which in turn bolsters the victim's statements tending to implicate the Defendant. This in turn tends to make Mr. Walen's contact with the victim relevant in the case thus making him a potential witness for the Defendant.

14. An actual and substantial conflict of interest on a material issue exists in the representation of the Defendant by Mr. Walen and all members of his law firm.

15. Although the Defendant waived the conflict of interest upon extensive questioning by this court, the deceased victim is obviously unable to waive the conflict of interest in the Defendant's continued representation by Mr. Walen.

STATE v. TAYLOR

[155 N.C. App. 251 (2002)]

Based upon its findings, the trial court concluded, "[a]n actual and substantial conflict of interest on material issues" existed in Walen's representation of defendant.

While defendant failed to assign error to any of the court's findings of fact in the record, he does argue in his brief that findings #13 and #14 are not supported by the evidence of record. Our appellate courts have long held that an appellant's failure to assign error to each finding of fact and to identify in his brief which findings are challenged, will result in the presumption that the findings are supported by competent evidence. *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (1999); *see also Concrete Service Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 684, 340 S.E.2d 755, 759-60 (finding that the failure of appellant to "except and assign error separately to each finding or conclusion that he or she contends is not supported by the evidence . . . will result in waiver of the right to challenge the sufficiency of the evidence to support particular findings of fact"), *cert. denied*, 317 N.C. 333, 346 S.E.2d 137 (1986).

Since defendant presents arguments in his brief as to the sufficiency of the evidence to support the trial court's Findings of Fact 13 and 14, we will review the propriety of those findings alone. The trial court's remaining findings are presumed correct, and are binding on this Court.

Defendant argues that there is no evidence in the record to support the scenario outlined by the court in Finding of Fact 13. We disagree.

The record demonstrates that both the State and Walen, as defense counsel, gave notice of their intent to use various statements of the victim, and that a number of the statements were conflicting. Further, Walen gave notice of his intent to use the power of attorney signed by him for the benefit of defendant. The following exchange occurred between the court and Walen at the disqualification hearing:

THE COURT: Do you intend to offer that power of attorney as evidence?

MR. WALEN: I don't know yet. I don't know if it's admissible. I don't—First of all, I contend that the dying declarations or not dying declarations are not admissible. And if in fact it is, there's two dying declarations.

THE COURT: Well—

MR. WALEN: Not one.

THE COURT: Mr. Walen, would you follow me here as I walk—

MR. WALEN: Okay.

THE COURT: —briefly, gradually through this case. I'm representing a defendant charged with murder.

MR. WALEN: Okay.

THE COURT: I've got some inkling of evidentiary matters that I can offer that the victim said my guy didn't do it.

MR. WALEN: Okay.

THE COURT: Okay. Are you telling me that I wouldn't offer that evidence?

MR. WALEN: Well, of course I would.

THE COURT: All right.

MR. WALEN: But there's—

THE COURT: And—

MR. WALEN: Okay.

THE COURT: Consistent with that contention that I have that the victim said my guy didn't do it—

MR. WALEN: Um-hum.

THE COURT: I've got evidence that after the shooting, before death, the victim gave my client a power of attorney, which tends to support the position the victim said my guy didn't do it. You tell me I wouldn't attempt to get that power of attorney in?

MR. WALEN: Of course you would. And I would. But that's not a conflict. How can that be a conflict, unless she said—

THE COURT: All right. Once you do offer that—

MR. WALEN: Okay.

THE COURT: —are you telling me they can't rebut that?

MR. WALEN: Absolutely, they can rebut that. But I'm not going to go into how or why that won't work. Because that's trial strategy. If we want to address that in camera, I'll be happy to address that.

THE COURT: Okay.

MR. WALEN: But I'm not going to sit here and tell Mr. Hicks how we're going to try this case, if we ever get to court.

THE COURT: Well, I suspect if I deny—if I rule at this point that the trial goes forward with you as counsel of record, I'll be honest with you, folks, it's impossible to tell how a case is going to come out, but I will not be surprised if in the middle of the trial I will hear one or both lawyers *stand up* and say, oops, I now see it. We've got a conflict. We've got a mistrial.

MR. HICKS: I see it now. I mean, I don't expect—

We believe that there was a substantial likelihood that the scenario outlined in Finding of Fact 13 would *occur* as *found by the* court; thus, we conclude that the finding is supported by competent evidence in the record, as well as, reasonable inferences to be drawn from that evidence, and is therefore binding on appeal.

Next defendant argues that there is no evidence to support Finding of Fact 14 in which the trial court concludes that "an actual and substantial conflict of interest on a material issue exist in the representation of defendant by Walen."

We first observe that the court labels its conclusion as both a finding of fact and conclusion of law; however, because it states no factual basis, it is in fact a conclusion of law and should be reviewed as such. *Wilder v. Wilder*, 146 N.C. App. 574, 553 S.E.2d 425 (2001); *State v. Rogers*, 52 N.C. App. 676, 681-82, 279 S.E.2d 881, 885 (1981) ("[f]indings of fact that are essentially conclusions of law will be treated as such upon review," and will be "upheld where there are other findings upon which they are based.") Thus, we will review the court's conclusion *de novo*; irrespective of the label applied. *Carpenter v. Brooks*, 139 N.C. App. 745, 752, 534 S.E.2d 641, 646, *disc. review denied*, 353 N.C. 261, 546 S.E.2d 91 (2000) (conclusion of law, even if erroneously labeled as findings of fact, are reviewable *de novo* on appeal; court "not bound by the label used by the trial court.")

Defendant argues that there are no findings to support the conclusion of law that an actual and substantial conflict of interest existed which would prohibit . . . Walen from representing . . . [him]" in this case. Defendant makes much of the fact that neither the statements made by the victim inculpating defendant as her attacker, nor the power of attorney prepared by Walen giving defendant power of

attorney over the victim's interests while Walen was counsel of record for the victim in a domestic case, were actually introduced into evidence at trial, thereby necessitating any compromise in Walen's level of representation. However, the failure of these situations to materialize in defendant's trial are not dispositive.

In this case, at an unusually early stage in the proceedings, the trial court was called upon to balance defendant's right to be represented by retained counsel of choice against standards of the profession, and the court's interest in assuring that a defendant have a fair trial. *See State v. Yelton*, 87 N.C. App. at 556, 361 S.E.2d at 755 (noting that issues of potential problems with representation are usually presented in post-conviction motions alleging ineffective assistance of counsel).

The United States Supreme Court has recognized the unique challenge of the trial court when a party presents the issue of a possible conflict of interest prior to trial. In *Wheat*, the Supreme Court stated,

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

486 U.S. at 162, 100 L. Ed. 2d at 151. In light of this "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a

potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.*; *see also Shores*, 102 N.C. App. at 475, 402 S.E.2d at 163 ("The trial court must be given substantial latitude in granting or denying a motion for attorney disqualification").

In the instant case, the trial court considered, in addition to the relevant case law, Rules 1.6, 1.7, and 3.7 of the Revised Rules of Professional Conduct of the North Carolina State Bar in making its determination of whether an actual conflict of interest existed. Revised Rule 1.6(c) prohibits an attorney from (1) revealing confidential information of a client; (2) using confidential information of a client to the disadvantage of the client, or (3) using confidential information of a client for the advantage of the lawyer or a third person, unless the client consents after consultation. The rule defines "confidential[ity] of information" as: "information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." R.P.C. 1.6(a). Revised Rule 1.6(a) specifically provides that " 'client' refers to present and former clients." *Id.* In its 1998 Ethics Opinion 20, the State Bar noted, "Although this definition may appear on its face to limit confidential information to information either received from the client or received during the course of the representation, the comment to the rule clarifies that '[t]he confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.' " 1998 N.C. Eth. Op. 20 (quoting Rule 1.6, cmt. 5). Revised Rule of Professional Conduct 1.7, which is the "General Rule" regarding a conflict of interest provides:

> A lawyer shall not represent a client if the representation of that client will be, or is likely to be, directly adverse to another client, unless:
>
> (1) the lawyer reasonably believes the representation will not adversely affect the interest of the other client; and
>
> (2) each client consents after consultation which shall include explanation of the implications of the common representation and the advantages and risks involved.

R.P.C. 1.7(a); *see also* Comment 3 to R.P.C. 1.7 ("As a general proposition, loyalty to a client prohibits undertaking representation directly

STATE v. TAYLOR

[155 N.C. App. 251 (2002)]

adverse to that client without the client's consent. . . . Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated). Finally, Revised Rule of Conduct 3.7 provides, pertinently:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case;

(3) disqualification of the lawyer would work substantial hardship on the client.

R.P.C. 3.7(a).

In *State v. James*, 111 N.C. App. 785, 790, 433 S.E.2d 755, 758 (1993), this Court examined the issue of a conflict of interest where the same attorney represented both the defendant and a prosecution witness, but in unrelated matters. *Id.* The Court noted that such a situation "creates several avenues of possible conflict for an attorney." *Id.* at 790, 433 S.E.2d at 758. The Court explained,

We believe representation of the defendant . . . as well as the prosecution witness (albeit in another matter) creates several avenues of possible conflict for an attorney. Confidential communications from either or both of a revealing nature which might otherwise prove to be quite helpful in the preparation of a case might be suppressed. Extensive cross-examination, particularly of an impeaching nature, may be held in check. Duties of loyalty and care might be compromised if the attorney tries to perform a balancing act between two adverse interests.

*Id.* The Court, therefore, held that an actual conflict of interest existed, which adversely affected counsel's representation of defendant. *Id.*

In the case *sub judice*, Walen was first employed to represent the victim in a domestic matter in July 1997 and continued to represent her in the matter until 9 October 1998, when counsel was allowed by order of the district court to withdraw as counsel of record for the victim. Defendant was arrested on charges that he feloniously assaulted the victim on 8 August 1998, and retained Walen to repre-

sent him also. Ten days later, Walen prepared a power of attorney giving defendant power of attorney over the victim's affairs while she lay immobile in the hospital. Prior to trial, Walen gave notice that he would present the evidence of the victim's execution of the power of attorney in defendant's favor to refute evidence that defendant shot the victim. In addition, both the State and Walen gave notice that they would be using conflicting statements made by the victim that defendant did or did not shoot her.

Walen's representation of defendant would inescapably be adverse to the victim, within the meaning of Revised Rule of Professional Conduct 1.7, since defendant was on trial for her murder, and Walen, in defense of defendant for that murder, could have been called upon to impeach statements made by the victim during his dual representation. In addition, although Walen was representing defendant in a matter unrelated to his representation of the victim, Walen had a duty of loyalty and care to the victim which could have been compromised by this dual representation. Similar to the Court's concern in *James*, the representation of defendant by Walen in the criminal matter, may have been hampered by his duty of loyalty and care to two competing interests. *See id.*, 111 N.C. App. at 790, 433 S.E.2d at 758. To this end, defendant would have been precluded " 'from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the Sixth Amendment.' " *Id.* at 791, 433 S.E.2d at 758 (quoting *Cataldo*, 625 F. Supp. at 1257).

Additionally, Walen was undoubtedly privy to some information regarding the victim's personal life and habits, her state of mind, etc., after having represented her for some fifteen months in the divorce proceedings. Such information would be most helpful in defending the person accused of her murder, especially if the defendant submits that the victim was distressed and shot herself or if the defendant intends to attack the victim's credibility. Such a scenario presents the potential that a defense of the charges in this case could compromise (or could be hampered by) Walen's duty of confidentiality under Revised Rule 1.6, as well as the duty of loyalty and care under Revised Rule 1.7.

Finally, although Walen was not actually called as a witness to testify, had certain other evidence been proffered by the State or defendant at trial, the possibility certainly existed. Walen's testimony while he represented defendant would be in clear derogation of Revised Rule of Professional Conduct 3.7.

We conclude that the trial court properly determined that there was an actual conflict of interest in this case. In light of this conflict, the presumption in favor of defendant's choice of counsel must give way. *Shores*, 102 N.C. App. at 475, 402 S.E.2d at 163 (citing *Wheat*, 486 U.S. at 164, 100 L. Ed. 2d at 152). Further, in such circumstances, the United States Supreme Court has provided that the trial court may justifiably "decline a proffer of waiver," and such a decision should be accorded wide latitude. *Wheat*, 486 U.S. at 162, 100 L. Ed. 2d at 150. In balancing defendant's right to retained counsel of choice against the court's interests in the proper administration of justice, we conclude that the trial court did not abuse its discretion in determining that an actual conflict of interest existed here, so as to justify disqualifying Walen and all of the members of his firm from representing defendant in this matter.

We do find it of concern that the State did not address its opposition about Walen's representation for nearly two years. However, we believe that defendant did not suffer prejudice since the newly appointed attorney had five months to prepare for trial. *Cf. State v. McFadden*, 292 N.C. 609, 234 S.E.2d 742 (1977) (holding that defendant was denied effective assistance of counsel when an attorney withdrew from the case because of a possible conflict of interest, the judge denied defendant's motion for a continuance, and the court-appointed attorney had only ninety minutes to confer with the defendant prior to the trial). This assignment of error is, therefore, overruled.

II.

**[2]** By his second assignment of error, defendant argues that the trial court erred in denying his motion to dismiss the charge of second degree murder. Specifically, defendant contends that there was insufficient evidence to show that he committed the crime as charged. We disagree.

A motion to dismiss is properly denied if the State offers substantial evidence—direct or circumstantial, or both—that the offense charged was committed, and that the defendant was the perpetrator. *State v. Montgomery*, 341 N.C. 553, 561, 461 S.E.2d 732, 735 (1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990). In ruling on a motion to dismiss, the evidence is to be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to

be drawn therefrom. *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455, *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). Contradictions or discrepancies in the evidence are matters for the jury to resolve, and do not warrant dismissal of the case. *Id.* at 379, 526 S.E.2d at 455.

" 'Second-degree murder is the unlawful killing of a human being, with malice, but without premeditation and deliberation.' " *State v. Welch*, 135 N.C. App. 499, 502-03, 521 S.E.2d 266, 268 (1999) (quoting *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983)). "The intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice." *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984); *see also State v. Hodges*, 296 N.C. 66, 72, 249 S.E.2d 371, 374 (1978) (providing that evidence showing defendant intentionally inflicted a wound with a deadly weapon which caused death "raises inferences of an unlawful killing with malice which are sufficient [to establish] murder in the second degree"); *State v. McNeill*, 346 N.C. 233, 238, 485 S.E.2d 284, 287 (1997) (providing that malice is presumed where the defendant intentionally assaults another with a deadly weapon, thereby causing the other's death). Such a presumption is sufficient to withstand a motion to dismiss for insufficient evidence. *State v. Barrett*, 20 N.C. App. 419, 422, 201 S.E.2d 553, 555, *cert. denied*, 285 N.C. 86, 203 S.E.2d 58 (1974). The issue of whether the evidence is sufficient to rebut the presumption of malice in a homicide with a deadly weapon is then a jury question. *Id.*

In the instant case, the evidence, taken in the light most favorable to the State, tended to show that the victim and defendant were the only two persons in the house at the time of the shooting; that prior to the shooting, one of the victim's friends overheard defendant threatening to kill the victim if she ever left him; that defendant and victim had an argument just before the victim was shot; that victim was shot in the back of the neck from approximately three feet away or from a distance greater than thirty inches; that subsequent medical analysis indicated that the victim's wound was not self-inflicted; and that the victim subsequently died as a result of complications from the gunshot wound to her neck.

The North Carolina Supreme Court was presented with a similar set of facts in *State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987). In *Childress*, the Supreme Court held that the trial court did not err in denying the defendant's motion to dismiss the charge of second degree murder for insufficiency of the evidence where the evidence

in the light most favorable to the State showed that (1) the defendant and the victim were the only two people in the residence when the victim was shot to death, and (2) the physical evidence showed that the victim was shot from behind at a distance of at least two feet away, and therefore, could not have shot himself. *Id.* at 229-32, 362 S.E.2d at 265-67. The Supreme Court noted that the defendant's contention that the victim's injuries were self-inflicted was inconsistent with the State's physical evidence, and that the evidence was therefore sufficient for the jury to reasonably infer that the defendant shot the victim. *Id.* at 231, 362 S.E.2d at 266.

Like the Supreme Court in *Childress*, we conclude here that there was indeed substantial evidence to show that defendant shot the victim. In light of the absence of any physical evidence to support defendant's allegation that the victim shot herself, we hold that the trial court did not err in submitting this matter to the jury. This assignment of error is also overruled.

## III.

**[3]** By his third and final assignment of error, defendant argues that the trial court abused its discretion in sentencing him within the statutory presumptive range since there was evidence to support the finding of various mitigating factors. Though defendant concedes that under existing statutory and case law, a trial court is not required to consider evidence of aggravation or mitigation unless it deviates from the presumptive range, *see* N.C.G.S. § 15A-1340.16(c) (2001); *State v. Campbell*, 133 N.C. App. 531, 542, 515 S.E.2d 732, 739 (1999), he invites the Court to revisit this issue. We decline defendant's invitation. *See In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (stating that when "panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court"). As defendant was sentenced within the presumptive range of sentences, the trial court did not abuse its discretion in failing to make findings in mitigation. G.S. § 15A-1340.16(c); *Campbell*, 133 N.C. App. at 542, 515 S.E.2d at 739. This last assignment of error is, therefore, summarily overruled.

In light of the above, we hold that defendant has failed to demonstrate that the trial court erred in either the conviction or sentencing and, thus, the judgment is affirmed.

No error.

Judges GREENE and HUDSON concur.