**UNITED STATES of America,**

v.

**Alfonso SEPE, Defendant.**

**No. 91–708–CR.**

United States District Court,
S.D. Florida.

April 21, 1998.

Larry LaVecchio, Asst. U.S. Atty., Ft. Lauderdale, FL, Russell R. Killinger, Asst. U.S. Atty., Miami, FL, Anne Schultz, Asst. U.S. Atty., Miami, FL, for U.S.

Jose M. Quinon, G. Richard Strafer, Miami, FL, for Alfonso Sepe.

## ORDER

ROETTGER, District Judge.

**THIS ORDER** will incorporate this court's oral findings announced from the bench on Monday, April 13, 1998 with appropriate editing plus modifications and additions to make it more readable and helpful to the Court of Appeals.

### STATUS OF CASE

Defendant Alfonso Sepe (hereafter Sepe) was indicted on 34 counts in a trial known locally as Operation Court Broom. Sepe was a judge of the state circuit court for Dade County (Miami).

Sepe's trial lasted several months. He was tried together with two other judges, plus attorney David Goodhart (hereafter Goodhart) on charges of bribery, kickbacks for appointments and, of course, RICO. Sepe was found not guilty on 30 counts and the jury was deadlocked on the other four counts.

Numerous appeals to the Eleventh Circuit resulted from the convictions of the other judges and the lawyers.[1] Those trials were presided over by Judge Jose Gonzalez and the appellate opinions plus Judge Gonzalez' decisions on Sepe's post-trial motion resulted in dismissal of two of the four remaining counts. The government dismissed count 103 in open court at the status conference on April 6, 1998 leaving Sepe as the only defendant yet to be re-tried and facing only one count, a RICO conspiracy charge.

When Judge Gonzalez took senior status, he recused himself from this case as did the first two district judges whose names were drawn to receive the assignment of this case. Thereupon, the case was assigned by the customary drawing to the undersigned judge.

The re-trial was set after a status conference held in April 1997 to begin in April 1998, with the precise date of April 13, 1998 selected after a subsequent status conference. In the year preceding the trial date no real problems were made known to the court at status conferences or by motion. The court blocked out six weeks for the trial.[2]

### STORM CLOUDS GATHER WITHOUT WARNING

The final status conference prior to the start of the trial occurred on Monday, April 6, 1998 with no hint of difficulty about the trial.

Government prosecutor LaVecchio was contending for a wide scope of relevance as to a RICO conspiracy charge and referred several times to Goodhart.

Consequently, the court asked the fateful question that opened the door to this controversy. The question and AUSA LaVecchio's very candid response are set forth from the transcript.

The court: Are you expecting to call Mr. Goodhart?

Mr. LaVecchio: There is a possibility that Mr. Goodhart will be called, yes.

Let me say now, because I see Mr. Quiñon standing up and I know what he is going to say, about a year ago, well, maybe a little less than a year ago, I had a conversation with Mr. Quiñon about this case.

And Mr. Quiñon at that time asked me if I anticipated David Goodhart testifying in this case. And I said to him, no, at this point I do not anticipate that. And he said to me, well, would you do me a favor and give me a heads up? Because if Goodhart is going to be a witness in this case, he has worked around my office. I happen to like

1. *See United States v. Shenberg*, 89 F.3d 1461 (11th Cir.1996); *United States v. Massey*, 89 F.3d 1433 (11th Cir.1996); *United States v. Castro*, 89 F.3d 1443 (11th Cir.1996); and *United States v. Shenberg*, 90 F.3d 438 (11th Cir.1996).

2. Because of the certainty of this matter going to trial—because the court could not imagine the government dismissing it, nor could it imagine Sepe pleading to the charges. Therefore no backup cases were set whatsoever. Consequently, a continuance in this case leaves a 6 week hole in the court's calendar. Not an inconsequential factor, but not a controlling one.

the guy. And I just can't cross examine this guy. And I said, fine, I will do that.

And the fact is there was no anticipation that Mr. Goodhart would in fact be a witness in this case until this past Friday. And that was the first time anybody from the government spoke with Goodhart about that possibility.[3]

This last paragraph is, however, untrue and discussed *infra.*

Mr. LaVecchio asserts that " . . . we didn't see this coming" . . . "and we were going to tell him (Mr. Quiñon) as soon as the Court recessed today." Transcript, April 6, 1998, p. 24, l.24. The court observed: "That might be a little late." Transcript, April 6, 1998, p. 25, l.25. It would be too late because as the court advised, the court would be in Key West the rest of the week in another trial. Transcript, April 6, 1998, p. 29, l.1.

The court notes both AUSA LaVecchio and Mr. Quiñon were more candid and credible at this status conference in their description of their previous conversations on the subject than they were on the witness stand a week later at the hearing. Thus, they confirmed an often-observed fact: lawyers make lousy witnesses.

At the close of the status conference on April 6, 1998 the court ruled orally: Mr. LaVecchio, you were ready on Thursday, April 2 to go to trial without Goodhart's testimony so plan on doing without it when we begin trial in a week.

Before we leave the status conference there are certain matters that must be addressed. After the court heard from Mr. Quiñon, AUSA LaVecchio responded[4]: "And I had no reason to believe that David Goodhart would be a witness in this case, like I said, until Friday which is the first time anybody from law enforcement had spoken to him."

With the first witness called by the government at the hearing on April 13, this statement of AUSA LaVecchio was revealed to be a bald-faced untruth because the FBI case agent, Hubert Allen Lane, testified he

called Goodhart at FCI Lexington on March 23 about whether Goodhart would be a witness (LaVecchio's description) and to ascertain whether or not he would submit to an interview. Not only was AUSA LaVecchio's assertion untrue it was the second time he made it. *See* p. 3 quoting from p. 23 of the April 6, 1998 transcript.

The court began trial in Key West on Wednesday, April 8, 1998, and received the government's motion for reconsideration, filed in the clerk's night box the evening of the 7th or wee hours of the 8th. The court commented upon reading it that, despite its factual inaccuracies, it certainly is intense and if the government had pursued learning from Goodhart if he would be a witness with the same intensity, there wouldn't have been the problem to wrestle with on the eve of trial.

Defendant filed a response on Thursday which was faxed to Key West. The government filed a reply on Friday but not received by this court in time to read on Friday. The government seems upset the court didn't advise the parties about having a hearing on its motion, but they didn't seek a continuance or seek to call any other witnesses.

However, on Friday in Key West there were far more pressing matters: at 0400 there was a collision between a tank truck and a car at mile marker 61 (Duck Key) which closed the Overseas Highway (U.S. 1). Five of the jurors lived east of the wreck; fortunately, three of them had spent the night in Key West so eleven jurors were present. Alas one juror on Big Pine Key only 30 miles from the courthouse didn't bother to come in until forcefully told by the deputy marshal to appear. Deliberations began and a verdict was returned although the highway didn't reopen until 6 p.m.

As requested by the government the court took evidence on its motion on the date scheduled for commencement of trial, April 13.

The FBI case agent since its inception in 1989, Hubert Allen Lane, testified he first

---

3. Transcript, April 6, 1998, p. 23, l.8 *et seq.*

4. Transcript, April 6, 1998, p. 29, l.7.

called on March 23, 1998, to FCI Lexington to speak with Goodhart. Allegedly (by the Government), this was to see if Goodhart was going to testify for defendant Sepe and, if so, to try to arrange an interview. Goodhart told him to speak with his attorney.

The government produced Mr. Lane and Mr. LaVecchio to testify that there was a casual conversation with Quiñon on December 29, 1997 outside the courtroom before the status conference on that date about Goodhart testifying. The government witnesses' testimony dovetails that Mr. LaVecchio said, well, no not at this time.

Mr. Quiñon recalled it as a conversation in a parking lot on about April of 1997 (Testimony, Transcript, April 13, 1998, p. 119) when he told LaVecchio, a friend of many years, that he had to know whether Goodhart would be called, because he would have to get out of the case if Goodhart testified because he had become fond of Goodhart over the last few years while Mr. Quiñon's partner, Mr. Strafer, handled Goodhart's appeal and he (Quiñon) could not cross-examine Goodhart.

Mr. Quiñon's version is far more credible and it was especially supported at the status conference on April 6. See the excerpt on p. 3. A number of matters support Quiñon's version being credible. After AUSA LaVecchio admitted on April 6 he might well call Goodhart to testify, but admitted only in response to the court's question, LaVecchio also acknowledged he didn't intend to tell Quiñon until after the status. Quiñon rose hurriedly to his feet—with the look of a man betrayed—and LaVecchio spelled out what had occurred and it strongly supported Quiñon's version.

Second, Quiñon waited to get assurance from AUSA LaVecchio before beginning the massive task of reviewing the transcripts (12,068 pages) of the first trial. Then Mr. Quiñon has spent the last three months holed up in an apartment preparing for this trial, seldom going into his office.

On the other hand, let's look at what the government was doing to obtain the testimony of Goodhart which it now desperately covets.

Nothing in 1996. Nothing in 1997. Nothing even though the decision of *U.S. v. Shenberg*, 90 F.3d 438 (11th Cir.1996) clearly opened the way for the government to subpoena Goodhart.

Nothing even though Goodhart's conviction was affirmed on the same date in 89 F.3d 1461 (11th Cir.1996).[5]

Nothing even though Goodhart's petition for certiorari to the Supreme Court was denied on December 8, 1997.

Nothing even though the petition for rehearing of the denial of certiorari was denied on January 26, 1998.

Nothing.

But only three weeks before trial on March 23, 1998 the case agent calls FCI Lexington to speak with Goodhart, allegedly to see if Goodhart was going to testify for Sepe.

That's the government's claim but it lacks credibility. If Goodhart was going to testify for Sepe, why would Quiñon be asking over several months whether Goodhart was going to testify for the government? Why indeed.

This court is probably one of the few judges left who served as a U.S. District Judge more years before the sentencing guidelines than with the sentencing guidelines in full force and effect.

These problems frankly never occurred the court's first 15 years on the bench because the government didn't hold all the cards for people under sentence. Now the government holds the Rook Card: The Rule 35 Card. Only the government can file a Rule 35 motion. That Rule 35 option was snatched away from the defendant, and also removed from the jurisdiction of the trial judge.

In any event, in the 10 plus years since the sentencing guidelines went into full force and effect in the federal court system we have come to a situation where the institutions of

---

5. The docket sheet does not reflect, nor did the government introduce evidence, that the mandate issued by the Court of Appeals was stayed

pending petition to the Supreme Court for a writ of certiorari pursuant to Rule 41 of the Federal Rules of Appellate Procedure.

the Bureau of Prisons are basically anthills of snitches, each one trying to figure out how to work a deal whereby the government will bestow a "get out of jail early" card upon them in the form of a rule 35 motion.

The court notes, too, that somehow Goodhart was transferred with alacrity from Lexington to Miami for a meeting on April 3, ten days before trial.[6] Does the government think the court could believe all this occurred in its alleged effort to see if Goodhart was going to testify for defendant Sepe?

The court has discovered since the hearing that a sealed order exists in this case in which the government appeared on March 27, 1998 at an "emergency" hearing before the magistrate judge and the Public Defender's Office withdrew and Mr. Crockett was appointed to represent Goodhart. Curiously, the file reflects no motion of the Federal Public Defender's Office to withdraw and no motion by Goodhart to have counsel appointed.

It gets curiouser: from the minute entry Goodhart was not there; Mr. Quiñon was not there; and the order was *sealed*! Why? Was Goodhart likely to flee? Hardly. Was defendant Sepe likely to flee? Hardly—he'd been on bond for seven years.

Why then was the order sealed? This court is stayed from pursuing that or from questioning Goodhart at this time about all this. Or was it sealed at the government's request[7]—the overwhelmingly usual situation—in order to hide it from Mr. Quiñon? Perhaps not. But does it reek of forthrightness? Of giving Mr. Quiñon a "heads up"? Of course it doesn't.

This court was not advised of it then and barred by the stay from even reading it now.

The court has set forth these rhetorical questions to show why the court finds AUSA LaVecchio's assertions to be lacking in credibility other than the credible excerpt set forth on p. 3 of this order that occurred immediately after the court's question unmasked what was going on and Mr. Quiñon quickly rose to his feet with his countenance reflecting betrayal by the U.S. Attorney's Office.

To summarize, Mr. Quiñon, Sepe's attorney has presented the more credible scenario: long prior to the December 29, 1997 status conference Quiñon told LaVecchio he had to know if Goodhart was going to testify because he (Quiñon) couldn't cross-examine Goodhart and would have to get out of the case. Understandably, Quiñon told LaVecchio he didn't want to review 12,068 pages of transcript plus other preparation for trial too early before the trial date of April 13, 1998 because matters would be forgotten. LaVecchio's response on the status conference of April 6 acknowledged the key parts of this and Quiñon's countenance reflected the reneging of the government.

But even if the government's version of the "casual conversation" before the December 29, 1997 status conference were credible, the government might not have been so culpable if it had stopped sitting on its thumbs as it had done since July 12, 1996 and had taken prompt action to pursue Goodhart's testimony.

If it had and had told Quiñon, that would have obviated Mr. Quiñon's intense 3 months preparation for trial—and spending defendant Sepe's money preparing for a second trial.

But the government did not. Instead, it waited until the eve of trial before it pursued Goodhart. And it still didn't advise Mr. Quiñon as promised. Simply put, the government ambushed Sepe's lawyer, Mr. Quiñon.

Add these factors up and they spell out governmental misconduct on a grand scale. And the only appropriate sanction is the exclusion of Goodhart's testimony.

This court is well aware of the scurrilous conduct engaged in by Sepe's co-defendants. Rotten business to be sure. On the other hand, Sepe has been tried on 34 same or similar counts as his co-defendants and been found not guilty of thirty counts and three other counts have been dismissed.

---

6. The Marshal's prisoner tracking system printout indicated Goodhart arrived in the Southern District of Florida on April 1, 1998.

7. A conversation between the Magistrate Judge and the undersigned confirms this.

Defendant Sepe—however reprehensible the alleged conduct—is entitled to a fair trial. This court is well aware of the principle that the citizens have the right to have all relevant and legally obtained evidence presented at trial and that the courts have an interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. The government cites several cases which set forth these principles in arguing that exclusion of Goodhart's testimony is inappropriate. *See Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Ross,* 33 F.3d 1507 (11th Cir.1994), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995); and *United States v. Hobson,* 672 F.2d 825 (11th Cir.1982).

However, in those cases the government was not guilty of misconduct. Here it is.

### ADDITIONAL FACTOR FOR THE COURT OF APPEALS' CONSIDERATION

This court found the government guilty of misconduct before it discovered the mysterious hearing of March 27, 1998 before the Magistrate Judge without the benefit of motions, notification to or presence of defense counsel, and resulting in a change of counsel for Goodhart in an order curiously *sealed.* This court would be happy to conduct further proceedings as to that hearing[8] or as to Goodhart, who wasn't called by either side at the April 13th hearing.

### CONCLUSION

The court asked both sides at the December 29, 1997 status conference to advise the court of any problems and "the earlier the better." Not only did the government not do so, it said nothing until the court on April 6 asked a point-blank question about Goodhart's testifying.

The government also assured Mr. Quiñon it would promptly advise him if Goodhart would testify; instead, it said nothing about its call to Lexington on March 23; nothing to him about the March 27 "emergency" hearing; nothing to him about Goodhart's being transferred to Miami on April 1; nothing about their meeting with Goodhart on April 3; and, indeed, intended not to tell Quiñon on April 6 until *after* the status conference was over.

The government was prepared on April 2, 1998 to go to trial without Goodhart as a witness; as a sanction for misconduct in this matter, it should proceed to trial against defendant Sepe without Goodhart as a witness. Where the government has been guilty of misconduct to the extent it has been in this case, a lesser sanction seems inappropriate.

---

8. There are tape recordings made of hearings before magistrate judges.