UNITED STATES, Appellee

v.

Robert E. BECKLEY, Sergeant
U.S. Army, Appellant

No. 00-0134

Crim. App. No. 9701282

United States Court of Appeals for the Armed Forces

Argued October 4, 2000

Decided May 18, 2001

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and SULLIVAN, GIERKE, and EFFRON, JJ.,
joined.  SULLIVAN, J., filed a concurring opinion.


Counsel


For Appellant:  Major Jonathan F. Potter (argued); Colonel
Adele H. Odegard(on brief); Lieutenant Colonel David A.
Mayfield and Major Scott R. Morris.

For Appellee:  Captain Karen J. Borgerding (argued);
Lieutenant Colonel Edith M. Rob and Major Anthony P.
Nicastro (on brief); Major Patricia A. Ham.


Military Judges:  Larry S. Merck, Richard J. Hough, and
Keith H. Hodges


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge BAKER delivered the opinion of the Court.

On December 19, 1996, and February 4, March 5-6, July 16, and August 4-5, 1997, appellant was tried at Fort Bliss, Texas, by a general court-martial composed of officer and enlisted members.  Appellant was convicted, pursuant to his pleas, of attempted escape from custody, attempted disobedience of a lawful command, false official statement, and assault with a dangerous weapon, in violation of Articles 80, 107, and 128, Uniform Code of Military Justice (UCMJ), 10 USC §§ 880, 907, and 928, respectively.  The members sentenced appellant to a bad-conduct discharge, confinement for 3 years, total forfeitures, and reduction to Private E-1.  The convening authority approved the sentence and awarded appellant 343 days of pretrial confinement credit towards his sentence to confinement.  The Court of Criminal Appeals affirmed in an unpublished opinion.

We granted review of the following issue:

> WHETHER THE STAFF JUDGE ADVOCATE'S OFFICE VIOLATED
> THE SIXTH AMENDMENT OF THE CONSTITUTION AND
> ARTICLE 38 OF THE UNIFORM CODE OF MILITARY JUSTICE
> BY INFRINGING ON APPELLANT'S CHOICE OF COUNSEL.

At issue is appellant's right to civilian counsel retained by appellant at his own expense, when that attorney is determined by the military judge to be disqualified under ethics rules because of a conflict of interest with a potential suspect in the charged offenses.  The matter was litigated extensively at a pretrial motions session pursuant

2

to Article 39(a), UCMJ, 10 USC § 839(a), but was not raised in appellant's posttrial submission to the convening authority pursuant to RCM 1105, Manual for Courts-Martial, United States (1995 ed.). We granted the issue because it touches on the Sixth Amendment guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." Because this issue is raised on appeal for the first time to this Court,[1] and because the issue is fact specific, a thorough review of the facts of record is warranted.

FACTS

As noted by the court below, the genesis of the initial charges against appellant, both those ultimately dismissed and those to which appellant pled guilty, is as follows:

> The rancorous dissolution of appellant's marriage was the catalyst of all of his misconduct. On 26 August 1996, Mrs. Beckley informed appellant of her desire for a divorce. Although appellant suspected his spouse of having an affair, he pleaded with her to stay with him, but she refused. Pursuant to Mrs. Beckley's request, appellant's first sergeant ordered appellant to move out of his quarters and reside with another noncommissioned officer in his unit until further notice.

> The following evening, 28 August 1996, appellant returned to his quarters to check up on

---

[1] The issue raised at the lower court was:

WHETHER THE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM MAKING RECOMMENDATIONS TO THE CONVENING AUTHORITY BECAUSE HE BECAME A WITNESS CONCERNING HIS OWN ACTIONS IN THE COURT-MARTIAL PROCESS, AND IF SO DISQUALIFIED, WHETHER THE DEPUTY STAFF JUDGE ADVOCATE, ACTING AS THE STAFF JUDGE ADVOCATE, WAS ALSO DISQUALIFIED FROM MAKING SUCH RECOMMENDATIONS.

3

his wife.  During this time period, a fire of suspicious origin caused substantial damage to the quarters.  Both appellant and Mrs. Beckley were questioned as suspects by a Criminal Investigation Command [CID] agent.  Mrs. Beckley claimed to have been in a hotel room with a male friend at the time of the fire.  Initially, appellant falsely claimed not to have been at the quarters at all on the evening of the fire.  He later admitted that he had been there, but denied causing the fire.  This change of story caused appellant to become the prime suspect for the arson.

On 29 August 1996, appellant was ordered by his company commander not to contact Mrs. Beckley. On the early morning of 30 August 1996, appellant attempted to see his wife, but she refused to come to the door and instead called the military police (MP).  Appellant was apprehended and transported to the MP station.  While there, appellant attempted to escape and in a struggle with an MP, appellant managed to unholster the MP's pistol, causing a round to be chambered.  Other MPs assisted in subduing appellant and placing him in the detention cell.

Unpub. op. at 2.

On December 19, 1996, at trial, and during the first Article 39(a) session, appellant was represented by Captain (CPT) Joel Novak, detailed military defense counsel, and Mr. Frank Hart, civilian defense counsel.  The detailed military judge was Colonel (COL) Larry Merck.  At the next Article 39(a) session, on February 4, 1997, Mr. Joseph Lucas replaced Mr. Frank Hart as civilian defense counsel.  Mr. Lucas stated on the record that he was licensed by the State of Texas.  At the Article 39(a) session on March 5, 1997, the detailed military judge was COL Keith Hodges.  At trial, appellant was represented by CPT Joel Novak, detailed

4

military defense counsel, and Mr. Jim Darnell and Mr. Jim Maus, civilian defense counsel.

### February 4, 1997, Article 39(a) Session

On January 31, 1997, the prosecution moved the court to order Mr. Lucas to show cause why he should not withdraw from representing appellant because the Lucas firm previously represented Mrs. Beckley.  Specifically, in November of 1996, Mrs. Beckley, appellant's then-wife, retained Ms. Herron, an attorney and a salaried employee of Mr. Lucas in Mr. Lucas' law firm, to represent her in a divorce proceeding against her husband.  Later, probably January 16, 1997, appellant retained Mr. Lucas to represent him.  Upon learning that the firm represented both Mrs. Beckley and appellant, and in spite of the fact that Mrs. Beckley hired the Lucas firm first, the firm returned part of Mrs. Beckley's money to her and informed her that they could no longer represent her.  Ms. Herron and Mrs. Beckley testified to these facts during an Article 39 (a) on February 4, 1997.  Additionally, Mrs. Beckley testified that she did not wish to waive the conflict of interest she had with the Lucas firm.

In response to the Government's motion, the military judge made the following findings:

(1)  On the 27th of August 1996, the [appellant's] quarters. . . were damaged by burning;

5

(2)  Property contained in those quarters belonging to Mrs. Beckley were [sic] burned.  The quarters were the Beckley quarters.

MJ:  Several of the charges also involved offenses alleging that Sergeant Beckley refused to obey orders to stay away from his wife, Mrs. Beckley.  Mrs. Beckley will be a witness in this case and she is an interested person in this case.  On the 25th of November, Mrs. Beckley paid $300.00 to the Lucas Law Firm.  She went in to hire an attorney to represent her in a divorce proceeding against her husband.  At that time she talked to Ms. Herron, who was an associate or a salaried employee of Mr. Lucas'.  Ms. Herron talked with her about what Mrs. Beckley wanted to have done.  They discussed confidential matters, to include the marital status and the marital situation for Mrs. Beckley, the fire, and other matters concerning the divorce proceeding and maintenance and also child custody.  This is confidential material.  On the 13th of December, Ms. Herron, or a member of the Lucas Law Firm filed a divorce petition with the 383rd Judicial Circuit.  On approximately the 28th of December, or thereafter, Sergeant Beckley's family contacted Mr. Lucas or Mr. Lucas' firm, seeking to have him represent their son, Sergeant Beckley, the accused soldier in this case.  Sometime, approximately after the 7th of January, after Mr. Hart had been contacted, Mr. Hart being the former attorney, and advised that he was no longer needed on the case, Mr. Lucas began talking with Sergeant Beckley concerning his case.  Sometime around the 15th or 16th of January, Mr. Lucas was actually retained by Sergeant Beckley.  On the 7th of January, Ms. Herron discovered that there apparently was a conflict brewing in the situation in that she was representing Mrs. Beckley and apparently Mr. Lucas was representing Sergeant Beckley.  On that date Ms. Herron talked to Mr. Lucas and advised him of her concerns.  Mr. Lucas said, "Don't talk to me about anything.  Have Mrs. Beckley come to see you, you cannot represent her, and have her come in and explain that to her."  Sometime around the 17th of January, Mrs. Beckley was advised by the law firm of the conflict and that they could no longer represent her; that she should come and sign a waiver.  Mrs. Beckley did not consent to this withdrawal, and did not agree to any waiver, and she has not agreed to any waiver to this point.

MJ:  Now, the court finds that this situation was innocently entered into.  That there was nothing

6

> intentional by either party, Ms. Herron or Mr. Lucas with regard to this apparent conflict.
>
> MJ: The court makes the following additional findings:
>
> > Ms. Herron, there is no waiver of her responsibility in this case in terms of her responsibility to her former client, or to her client. Since there is no waiver, Ms. Herron has a continuing obligation to preserve information that might have been imparted to her in confidence during that representation. This is true during the course of her representation and even after the representation. Moreover, she also has the obligation not to oppose a former client in any matter in which the confidential information would be relevant unless the former client consents to do that. And as I indicated previously in my finding, Mrs. Beckley has not agreed to do that. Moreover, when Ms. Herron has received confidential information from Mrs. Beckley, she may not thereafter use the confidential information to Mrs. Beckley's disadvantage unless Mrs. Beckley agrees to do that. Additionally, Ms. Herron may not oppose her client in a matter that is substantially related to matters in which the lawyer represented the former client. <u>Now, although the issue in this case is a criminal trial, the issues in the divorce proceeding, at least in part, resulted from matters that led to this criminal trial and they are substantially related. Finally, if Ms. Herron were to be representing Sergeant Beckley, it would be very clear that there's a conflict of interest in this case. Ms. Herron is not representing Sergeant Beckley, Mr. Lucas is. However, generally if one lawyer in a law firm has a conflict of interest and cannot take on a matter that also is imputed to the other member of the law firm. Now, I note that this case involves a fairly small law firm, and I find that there is a conflict of interest in this case, or at the very least, a serious possibility of a conflict of interest</u>.

(Emphasis added.)

At this point, the military judge stated: "The government asked me to take Mr. Lucas off the case. I'm not

going to do that." He then explained to appellant the possible implications of this decision. He explained that Mr. Lucas may not be able to cross-examine appellant's wife if she was called to testify, to conduct voir dire on anything dealing with his wife's testimony, to present evidence that would discredit appellant's wife or impeach her testimony, and to argue in opening and closing statements "any matters that have been presented concerning" appellant's wife.

### March 5, 1997 Article 39(a) Session

On February 22, 1997, Mr. Lucas submitted a Motion for Withdrawal. In the motion, Mr. Lucas stated that at the time of the February 4, 1997, Article 39(a) session, there was "no conflict between counsel and government's witnesses in this case." He also stated that "[a]fter a thorough investigation of this case, a conflict appears to exist and requires counsel to withdraw." As support for the motion, Mr. Lucas attached the State of Texas Bar Rule 1.06. Mr. Lucas also referenced Army Regulation (AR) 27-26, Rules 1.6 through 1.9. These rules provide guidance to a lawyer or the lawyer's firm concerning conflicts of interest that arise in representing clients that are opposing parties to the same litigation.

The motion was considered by COL Keith H. Hodges, who was the new military judge detailed to the court-martial.

8

Mr. Lucas stated, on the record, his reasons for withdrawing.

First, On February 4, 1997, at the conclusion of the first Article 39(a) session, Mr. Lucas and appellant were in the deliberation room talking. Major (MAJ) Meredith, the head of the military justice section, told Mr. Lucas that if Mr. Lucas continued on this case, he would file a grievance against Mr. Lucas with the Judge Advocate General of the Army and through the State Bar. MAJ Meredith stated that he had talked to COL Holland (the Staff Judge Advocate) and "we will do that."

Second, that caused Mr. Lucas "great concern." As a result, the next day he spoke with a State Bar representative and explained the problem to him. At that time, the representative said, "I don't see any problem unless something comes up that, in the future, that would cause something adverse to Mrs. Beckley."

Third, approximately 10 days later, after obtaining the CID file and further investigating the case, information was obtained that Mrs. Beckley's car may have been seen in the area at the time of the fire. Mr. Lucas thought the information was adverse to Mrs. Beckley.

9

Fourth, even though Mr. Lucas never spoke to Ms. Herron about her representation of Mrs. Beckley, after discovering the adverse information, Mr. Lucas again contacted the State Bar representative. He was advised that adverse information would bar him from representing appellant.

Fifth, based on this advice, Mr. Lucas concluded that he had a conflict or an appearance of conflict under Texas Rule 1.6.

Sixth, after stating his reasons for withdrawing from his representation of appellant, Mr. Lucas also stated that the "prosecution and command" have "done everything in the world to discredit me." He referred to an ethics class given by the command on February 28, 1997, in which Ms. Herron, Mr. Lucas, appellant, and Mrs. Beckley were mentioned by name in a handout. The handout discussed the ethical implications of Mr. Lucas and his firm representing appellant and Mrs. Beckley.

These facts, as well as his confrontation with MAJ Meredith were also set out in Mr. Lucas' Brief in Support of Motion to Withdraw, including a copy of the handout. In the concluding paragraph of the brief, he stated:

> No attorney with an ounce of sense would continue with the vindictiveness of the prosecution team at Fort Bliss. <u>They have consistently threatened and humiliated me and left me no choice but to withdraw from this case</u>. Only they can tell you their real reason for their action.

10

(Emphasis added.) As recounted above, Mr. Lucas' assertion was based on two events: his conversation with MAJ Meredith in the hallway after the February 4, 1997, Article 39(a) session, and the ethics class given by the command on February 28, 1997.

Although Mr. Lucas stated on the record that he was withdrawing because of a conflict discovered after the first Article 39(a) session, the military judge continued to question Mr. Lucas about what impact MAJ Meredith's threat to report him to his bar association and the ethics class had on his decision to withdraw from representing appellant. The following exchange took place:

> MJ: Okay. Now, but back so I make sure that I, you know, what is done with regard to what Major Meredith did or didn't do, or Colonel Holland did or didn't do, I want to know what I'm dealing with. I want you to presume that Major Meredith and Colonel Holland never had a discussion; . . . that you never had a discussion or a threat or intimidation or anything from Major Meredith or Colonel Holland, but simply, simply, based upon the new information you received, do you believe you're required to withdraw?
>
> CDC: Yes, sir.
>
> MJ: Do you believe that what Colonel Holland or Major Meredith purportedly did is relevant to my determination of whether or not you should withdraw:
>
> CDC: I would like to answer that like it is relevant to my thinking of everything that has happened in this case, but to your decision, no.
>
> MJ: I don't understand the distinction.

11

CDC: Well, Your Honor, - - - -.

MJ: See, what you're saying is, it's not relevant, but on the other hand you left the door open which says, "I feel, I, Mr. Lucas, feel intimidated and threatened and I'm afraid to continue to represent Sergeant Beckley because I don't know what they will do to me," and therefore depriving Sergeant Beckley of his choice of lawyers.

CDC: I understand the predicament you're in, Your Honor. No matter what happens, because of the information that was received by me, after a careful investigation of this case, I have to get out, period. I think I've said that three or four times. And that's not even a question. But I also think, and as I understand, after rehashing all of the ethical rules, I think that when something happens that should not happen, I have a duty to report it to the court.

MJ: You got it.

CDC: And that's why I did not.

MJ: What I'm saying is, do you waive, as much as you can waive, given your current situation, --- you fulfilled your duty to report it to the court and I'll see that further action is taken in terms of the ethics rules. My question to you is, is the fact that you were threatened and what they might to [sic] do to you or your reputation or cause you expense or time or effort, is that a factor in your withdrawing?

CDC: No, Your Honor, it can't be because I would have to withdraw any way [sic]. It cannot be, because no matter what would happen, and I explained that to Sergeant Beckley, not [sic] matter what happens, because of the information that we gathered I had no choice.

(Emphasis added.)

After this exchange took place, the military judge reviewed the final paragraph of Mr. Lucas' Brief in Support of Motion to Withdraw, and called it an "appellate hand

12

grenade." Because of this concern, the military judge revisited Mr. Lucas' reasons for withdrawing, as follows:

> MJ: And I'm reading the last two sentences of Appellate XXX, "They, the government, have consistently threatened and humiliated me and left no choice but to withdraw from this case."
>
> CDC: That is correct.
>
> MJ: That tells me, that because they have consistently threatened and humiliated you, they left you no choice but to withdraw from the case.
>
> CDC: I have no choice but to withdraw from the case, and maybe that's a bit strong.
>
> MJ: Because of the threats or because of the conflict?
>
> CDC: Because of the conflict. Your Honor, had they told us what the conflict was the day that they said I had a conflict, which they did [sic], we wouldn't be here today.

Later that same day, the question was revisited for a third and final time:

> MJ: This Article 39(a) Session is called to order. All are present as before. Mr. Lucas, anything you wish to add or detract from what we've gone over so far?
>
> CDC: Yes, Your Honor. When you were questioning me, you asked me about, you know, the final decision. The final decision was this conflict that came into being. But I don't want to mislead the court. The day after the threat I told Sergeant Beckley and Captain Novak that I might have to get off, and I do want to represent to this court that that did worry me and it was a lot of my concern, but the crowning blow was the conflict, and I don't want to minimize the effect that the threats and the rest of the thing affected me.
>
> MJ: Well, we're back to where we were. You've described the subsequent information to be the

13

crowning blow as in the straw that breaks the camel's back.

CDC: Yes, sir.

MJ: Okay. And that's different than- - -it's a different position than without the threats you still would have had [sic] removed yourself?

CDC: No, it is not, Your Honor. It is not. I'm not trying to say that at all. What I'm saying is, is that this final thing I probably would have had to go off any way.

MJ: Well, that's different too. Probably would have had [sic] gone off. See, here's my dilemma. My dilemma is, do I need to have a fact finding situation concerning the threats that were made. If the threats that were made is [sic] contributing factor to your getting off the case, then I have to do something different than what I plan on doing. If, however, the threats are immaterial to your having to get off the case, if you would have to get off the case any way [sic], then I don't need to go into the threats.

CDC: Your Honor, I believe that I would have to get off the case any way [sic] and I don't have a problem with that.

MJ: How sure are you?

CDC: Very sure.

MJ: Well, would you say no doubt?

CDC: There may have been a way around it, but I don't know if that would have materialized or not.

MJ: So then, I have no choice but to conclude then that you might still be staying on the case if the threats weren't made?

CDC: The chance of that is very remote. There could be a possibility of that. There's always a possibility of things.

MJ: So what do I do?

CDC: Pardon me?

14

> MJ: So what do I do?  So if I got Major Meredith relieved and I got Colonel Holland relieved and shipped away from Fort Bliss would you stay on this case?
>
> CDC: No.
>
> MJ: Because?
>
> CDC: Because I've determined that there's a conflict that is adverse to Mrs. Beckley.

(Emphasis added.)

### March 6, 1997, Article 39(a) Session

Notwithstanding this exchange, after recessing for the evening, the next morning the military judge expressed his intention to hold an evidentiary hearing into the allegations expressed in the concluding paragraph of Mr. Lucas' Brief in Support of Motion to Withdraw.  Col Holland, MAJ Meredith, CPT Novak, and Mr. Lucas all testified.  At the conclusion of the testimony, the military judge adopted the findings of fact made by the first military judge at the first Article 39(a) session and made the following additional findings of fact:

> MJ: Mrs. Beckley was the first to establish a relationship with the Lucas firm in seeking a divorce from her husband.  Once it was discovered that an attorney/client relationship had been inadvertently entered into with her husband, the only logical and real choice was to discontinue the representation with both.  Assuming a relationship could be continued with one of the clients but not both, it is Mrs. Beckley who should have been permitted to be represented.  And to this day, Mrs. Beckley has not given permission for the defense team to represent Sergeant Beckley.  There was no reason to simply inform

15

Mrs. Beckley that she was no longer going to be represented by the Lucas firm. That the firm believes that the matter involving Sergeant Beckley is more important is not a factor and certainly, not the firm's call to make. Mrs. Beckley should have been fully informed long ago and given a choice. While we wonder what conflicts might exist or possibly exist, the one conflict that has long existed is this: This was a divorce action by Mrs. Beckley. That spells conflict. And further, what should or shouldn't be done in a criminal case and the outcome of the criminal case, has a direct impact on the divorce action, the wording of the final decree and what the parties expect to get.

I find that Colonel Holland was the prime mover, that is, the one pushing on the motion to have Mr. Lucas withdraw. I find that his reasoning for doing so was motivated by legitimate ethical concerns and Colonel Holland was correct, a conflict existed. It still exists with respect to Mrs. Beckley – no matter Mr. Lucas' choice in whether to stay on the case. I find that but for Colonel Holland's legitimate concern, the government, that is the prosecutors, would not have sought to have Mr. Lucas removed on the conflict issue. Further, I find that the government generally, and Major Meredith specifically, had no reason or desire to have Mr. Lucas leave the case, but for the conflict issue. The theories offered on that point is [sic] utterly without merit.

Colonel Holland did send Major Meredith with the mission of informing Mr. Lucas that no matter what Mr. Lucas' involvement on the Beckley case, that Colonel Holland or someone else under his name was going to file a grievance against Mr. Lucas. That position is fully supported by the facts; not only before Colonel Hough, but even more so [sic] clearly before this court during these last two sessions. Whatever words that Major Meredith used, I can't say what he said, because he doesn't recall, but it's certainly a reasonable interpretation by Mr. Lucas that Mr. Lucas believed that he was being told that if he remained on the case, a grievance would be filed. Why Mr. Lucas did not bring this to the attention of the court right then and there, instead of

16

waiting a month, tells me that Mr. Lucas didn't believe him – in the sense that he wasn't intimidated. He "blew off" Major Meredith and this threat was not a concern to him.

I find that the ethics class was planned in advance of the prior motions session and was to be an ethics class. I find that the class would have been given whether the conflict matter had been litigated or not. Unbeknownst to Colonel Holland in advance, the matters in Appellate Exhibit XXXI-A were used for the instruction. The only things in that class that had anything to do with the conflicts motions were motions filed by both parties and a recitation of the facts. Curiously though, the defense complains about these documents being provided to the students. There is nothing meaningful or substantial in these documents that are [sic] untrue. In other words, while the defense didn't like being the subject of the class, there is no evidence that the handouts or the discussion was [sic] derogatory, inflammatory or humiliating. It was a real-life discussion of a real-life situation. That no one thought to pursue this matter until Colonel Holland got involved is a good reason that this was a topic that needed to be taught. Captain Novak, who is co-counsel in this case, was present and did not object to the class and, in fact, remained. Wisely, he did not participate in the discussion on that matter. Looking back, I think it would have been wiser to wait teaching that instruction until after the Beckley trial was had, however, it was not unlawful or improper to do so. It was a legitimate topic for a class. It was needed and there was no evil intent of [sic] having discussed it.

A question has been asked, "Why were names omitted from one scenario but included in another?" I adopt Colonel Holland's explanation. I find as a fact that one was a matter still under litigation, that is the Love Notes, whereas the other matter was something that had been litigated publicly and in a public trial. I find that the motive, reason and intent of conveying the information to Mr. Lucas by Major Meredith was to appraise [sic] him of something that he did not appreciate then, but admits to appreciating now and that is that he should not be on this case, because of the

17

> conflict between Sergeant and Mrs. Beckley. He
> also should not be Mrs. Beckley's lawyer.
>
> <u>Colonel Holland's concern was a legitimate one and
> one that was kind and fair to tell Mr. Lucas about
> in advance that Colonel Holland believed Mr. Lucas
> had a serious ethical dilemma</u>. It was also
> something that Sergeant Beckley needed to know to
> assist in his choice. As evidenced by the fact
> that we are now in the first half of the month of
> March, and that means that there's been a delay in
> your pretrial confinement. . . .It was also the
> courteous and professional thing to do, to see
> that he was informed – to advise an attorney that
> you believe you had to make an ethical complaint.
> If the complaint were made later, a motive in
> making the complaint would also have been suspect.
> Also, <u>the government was well within their rights
> in this case to end what they saw as a serious
> appellate issue of a Constitutional dimension</u>.
> Much has been suggested about the professional
> disagreements between Mr. Lucas and Major
> Meredith. All that's worth noting is that they
> disagree and do not necessarily hold each other at
> high stand [sic].
>
> I find that the motion to withdraw is not based
> upon a genuine fear or a genuine belief that the
> government wanted Mr. Lucas off for strategic or
> tactical trial advantage. Those are all the
> findings that I have.

(Emphasis added.)

As noted by the military judge in his findings of fact, questions about the prosecution's personal and professional animosity toward Mr. Lucas were raised by Mr. Lucas as a motive for them to get him off the case. During his testimony, MAJ Meredith stated several times that he regarded Mr. Lucas as a lawyer who "fights dirty." Nevertheless, when asked by the prosecution about his motive

18

in telling Mr. Lucas of COL Holland's intention to file an

ethics complaint, MAJ Meredith testified:

> Well, I wanted him to know what the colonel told
> me to tell him.  And honestly, I was hoping that
> he would just withdraw then, because I thought it
> would be better for him, better for us and better
> for everybody.  I was really hoping that would
> help him.

> \* \* \*

> Well, why would I – Look it, Mr. Lucas, in spite
> of the fact that I've said he fights dirty and all
> that, in another sense, I consider him a friend.
> I've talked with him many times.  He's very
> vigorous.  I think that he does well for his
> clients.  Why would I want another guy to be
> getting in trouble over ethics stuff?  I wouldn't
> mind beating him in court, but I don't want him to
> be getting into trouble over ethics business.

DISCUSSION

As we recently discussed in United States v. Spriggs,

52 MJ 235, 237-38 (2000):

> Congress has provided members of the armed forces
> facing trial by general or special court-martial
> with counsel rights broader than those available
> to their civilian counterparts.  A military
> accused in such proceedings has the right to
> representation by government-compensated military
> counsel regardless of indigence and also has the
> right to select a particular military counsel in
> limited circumstances.

We also noted in Spriggs that

> [t]he right to counsel before general and special
> courts-martial is governed by Articles 27 and 38,
> UCMJ, 10 USC § 827 and § 838, respectively.  There
> are three types of counsel under these statutes:
> (1) detailed counsel; (2) individual military
> counsel; and (3) civilian counsel retained by the
> accused at his or her own expense.

19

Id. at 238.  Unlike Spriggs, which dealt with the right to a military attorney, at issue here is the right to civilian counsel retained by appellant at his own expense.

In Wheat v. United States, 486 U.S. 153 (1988), a case involving the joint representation of codefendants, the Supreme Court held that the right to counsel is not absolute.  It said:

> The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects.  Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant.  Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government.

Id. at 159 (footnote omitted) (emphasis added).

In the military the right to counsel, likewise, is not absolute.  RCM 506(c), which implements Articles 27 and 38, provides that defense counsel may be excused "with the express consent of the accused, or by the military judge upon application for withdrawal by the defense counsel for good cause shown."

This is not a case where we must labor to define the parameters of "good cause."  Here, "good cause" is provided by the ethical standards of the legal profession, in particular, Texas State Bar Rule 1.06(b), which prohibits representing a person "if the representation of that person

. . . involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm."  Rule 1.06(c) permits representation that would otherwise be prohibited by Rule 1.06(b) if "the lawyer reasonably believes the representation of each client will not be materially affected; <u>and each affected or potentially affected client consents</u>" after full disclosure of the facts and circumstances.  (Emphasis added.)

Similarly, Rule 1.7 of AR 27-26 (1 May 1992), provides that "<u>[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless. . .each client consents after consultation</u>."  (Emphasis added.) Rule 8.3 also requires an Army lawyer to report an ethical violation by "another lawyer."

Whether appellant's and Mrs. Beckley's interests were directly adverse from the moment the Lucas firm agreed to represent appellant or became directly adverse upon the later discovery of information adverse to Mrs. Beckley, it is very clear from Mrs. Beckley's testimony at the February 4, 1997, Article 39(a) session that she refused to consent to Mr. Lucas' or his firm's representation of appellant.  At no time did Mr. Lucas indicate at any point during trial that Mrs. Beckley had changed her mind concerning the matter

of representation. The only consent indicated on the record was appellant's. However, both the Texas and the Army Rules are clear that consent of both affected parties is required.

As the Supreme Court noted in Wheat:

> Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

486 U.S. at 159. In Wheat, the petitioner sought representation by an attorney who already represented three other defendants involved in the same drug distribution conspiracy. Unlike this case, the three defendants and Wheat agreed to waive any future conflict of interest arising from such representation. The Government objected, inter alia, on the ground that counsel would be prevented from cross-examining the other defendants on behalf of Wheat in a meaningful way. The district court agreed and overrode Wheat's waiver. The Supreme Court held that "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented." Id. at 162.

The Court went on to review anew why the right to counsel does not override the broader societal interests in the effective administration of justice. It stated:

22

> Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. . . .[A] conflict may . . . prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.

Id. at 160, quoting Holloway v. Arkansas, 435 U.S. 475, 489-90 (1978).  Moreover, the Court in Wheat explained that

> [u]nfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.  It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand.  A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.  These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics.  Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

Id. at 162-63.

In applying Wheat to this case, where only one of the parties waived the conflict of interest,[2] we have no problem holding that neither the Staff Judge Advocate's office nor the trial court violated the Sixth Amendment or Articles 27 and 38 by infringing on appellant's choice of counsel.

Mr. Lucas' allegations regarding the conduct of the Staff Judge Advocate's office does not change our analysis in this case. The military judge concluded after extensive litigation that the Staff Judge Advocate had a legitimate concern about Mr. Lucas' ethical dilemma, and that it was an exercise of professionalism to so inform Mr. Lucas before reporting him to the bar association. Further, the military judge made repeated and commendable efforts to probe the nature and reasons for Mr. Lucas' withdrawal and to ensure

---

[2] Wheat is a 5-4 decision; however, it is worth noting that two of the dissenters readily distinguish the facts here from those in Wheat by noting that their dissent addresses "only cases in which all parties to the potential conflict have made a fully informed waiver of their right to conflict-free representation." Id. at 166 n.1 (Marshall, J., with whom Brennan, J., joins, dissenting).

that it was not the product of government overreaching. Mr. Lucas repeatedly stated on the record that he had to withdraw because of a conflict of interest, not because of what he characterized as harassment and intimidation by the Office of the Staff Judge Advocate. The military judge had every right to take this officer of the court at his word.

This is not to say that the actions of the Office of the Staff Judge Advocate were not correctly perceived as heavy-handed. The actions of the Office of the Staff Judge Advocate may have been more than circumstances required, and rather than avoiding an appellate issue, these actions became part and parcel of the appeal. Nevertheless, they were not the cause for Mr. Lucas' withdrawal. Mr. Lucas had an actual conflict of interest for which he was required to withdraw.

The decision of the United States Army Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring):

Justice Brandeis said: "Sunlight is said to be the best of disinfectants." [*] Accordingly, I am obliged to draw attention to certain facts in this case.  Although I join in affirming this case, I am troubled with the Staff Judge Advocate's conduct.  Under the Rules for Courts-Martial, only an accused or the military judge may excuse the defense counsel after formation of the attorney-client relationship.  See RCM 505(d)(2)(B) & 506(c), Manual for Courts-Martial, United States (1995 ed.).  Here, trial counsel made a motion pursuant to RCM 505(d)(2)(B)(iii) and 905 to have defense counsel show cause why he should not withdraw.  Cf. United States v. Iverson, 5 MJ 440, 442-3 (CMA 1978)("Absent a truly extraordinary circumstance rendering virtually impossible the continuation of the established relationship, only the accused may terminate the existing affiliation with his trial defense counsel prior to the case reaching the appellate level.") (footnotes omitted).  The military judge, however, refused to order defense counsel to withdraw.

Notwithstanding the judge's ruling, the Staff Judge Advocate acted outside the courtroom and took actions that may have

---

[*] Louis D. Brandeis, Other People's Money 92 (1932).

United States v. Beckley, No. 00-0134/AR

resulted in the defense counsel terminating his relationship with his client. The Staff Judge Advocate instructed MAJ M., his Chief of Criminal Law, to inform Mr. Lucas, appellant's civilian defense counsel, that someone from the Office of the Staff Judge Advocate would file an ethics complaint against him. Record at 222. Moreover, in the midst of appellant's trial, the Command gave an ethics class based on the facts of appellant's case which appellant's military defense counsel attended. Record at 223-24. In my view, these actions are clearly not consistent with the spirit of the above Rules for Courts-Martial, but I vote nevertheless to affirm since such errors were clearly harmless in this case. Art. 59(a), UCMJ, 10 USC § 859(a). The judge must run the courtroom, not the Staff Judge Advocate.