GOULD, Circuit Judge,
dissenting:
We confront in this case an unusual confluence of circumstances. A highly controversial criminal defendant is a few months away from an enormous trial effort in which he and eighteen other individuals are defendants. The defendant’s chosen attorney has been denied admission pro hac vice to the district court, raising in my mind serious concerns about the defendant’s ability to mount a vigorous defense and receive a fair trial. Despite the majority’s expressed apprehensions about the chosen attorney’s willingness to follow the rules of professional conduct and the orders of the district court, while recognizing the high standards for mandamus relief, I would hold that the writ should issue. My concerns about the defendant’s ability to present a strong defense and receive a fundamentally fair trial are simply top great, leading to my dissent. •

[1]

On March 2, 2016, . Oliven D. Bundy and eighteen others were indicted on various federal charges for their alleged involvement in a “massive armed assault” on federal officials near Bunkerville, Nevada nearly two years prior. The now-unsealed Superseding Indictment alleges that -on April 12, 2014, Bundy led “hundreds of *1048 people, including gunmen armed with assault rifles” in a coordinated assault against the government officials.
The events that day grew out of a dispute between Bundy and the federal Bureau of Land Management. According to the Superseding Indictment, for over 20 years Bundy, a rancher, had refused to obtain permits or pay the required fees for his cattle to graze on federal public lands. As a result, since 1998 Bundy had been under a federal court order to remove his trespassing cattle. He never complied with the order, and in 2013 federal officials received authorization to seize and remove Bundy’s cattle from the land. They began the process of seizure and removal on April 5, 2014.
While the removal process was ongoing, it is alleged that Bundy and his codefen-dants used the internet and other means of interstate communication to recruit gunmen and “Followers” to travel to Nevada to help Bundy make a show of force against the federal government. The defendants’ online communications allegedly included requests for help from members óf anti-government militia groups. The content of the communications referred to the federal government as corrupt and to government officials as thieves. Bundy was portrayed as a victim of government abuse whose sovereign rights had been violated. Other statements alleged in the Superseding Indictment show that Bundy viewed himself as involved in a “range war” with federal officials.
By the morning of April 12, 2014, more than 400 people had allegedly shown up to help Bundy, many of them allegedly armed with assault rifles or other weapons. Approaching from two different vantage points, Bundy and these Followers allegedly used firearms to threaten federal officers into giving up Bundy’s cattle. The Government also claims that after getting his cattle back, Bundy organized his Followers into armed security patrols and checkpoints for the purpose of protecting his cattle against future government seizures.
II
A writ of mandamus is an extraordinary writ used “to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.” Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (internal quotation marks omitted). We have jurisdiction to grant such writs under 28 U.S.C. § 1651.
For a writ of mandamus to issue, the party seeking the writ must satisfy three requirements. First, the petitioner must have no other means of attaining the desired relief. In re United States, 791 F.3d 945, 954 (9th Cir. 2015). Second, the right to issuance of the writ must be “clear and indisputable.” Id. (quotations omitted). Third, even if the first two prerequisites are met, we must be satisfied in the exercise of our discretion that the writ is appropriate under the circumstances. Id. at 955. In assessing whether the writ is appropriate, we examine five factors: (1) whether the party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court’s order is clearly erroneous as a matter of law; (4) whether the district court’s order is an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court’s order raises new and important problems, or issues of law of first impression. Bauman v. U.S. Dist. Court, 557 F.2d 650, 654-55 (9th Cir. 1977). These factors should be viewed as guidelines, not requirements, and *1049 should be weighed together, as appropriate to the facts of the case. DeGeorge v. U.S. Dist. Court., 219 F.3d 930, 934 (9th Cir. 2000). Typically, the absence of the third factor, clear error as a matter of law, will defeat the petition. Id.
In my view, both the first and second Bauman factors weigh solidly in favor of granting relief. We have previously recognized that parties denied pro hac vice admission are unable to obtain immediate relief through an appeal because the denial of admission is neither a final appealable order under 28 U.S.C. § 1291 nor an interlocutory order appealable under 28 U.S.C. § 1292. See In re United States, 791 F.3d at 958. Losing counsel of choice through a denial of pro hac vice admission also produces a harm that is not correctable on a later direct appeal. Id. at 959. I view the fourth Bauman factor as weighing against granting the writ. As I discuss below, this case is unusual in that Bundy faces an imminent, massive and complex trial, as well as difficulties in retaining qualified counsel. These circumstances make any error by the district court of a type not likely to be repeated often. And I view the fifth factor as weighing slightly in favor of granting relief. The central issue in this case—whether denying Klayman’s admission significantly impairs Bundy’s ability to present a strong defense—is vastly important, but is only an issue of first impression in the sense that the circumstances Bundy finds himself in are relatively atypical. I more fully discuss these circumstances below.
The outcome of this case turns not on the first, second, fourth, or fifth Bauman factors, but on the third: whether the district court clearly erred in denying Klayman’s pro hac vice application. In assessing this factor, I maintain a keen awareness of the deference we give to the district court. We grant mandamus petitions only sparingly, as writs of mandamus are an “extraordinary or drastic remedy.” Calderon v. U.S. Dist. Court for Cent. Dist. of California, 163 F.3d 530, 534 (9th Cir. 1998) (en banc) (internal quotation marks omitted), abrogated on other grounds by Woodford v. Garceau, 538 U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). The task of looking for clear error is a manifestation of this deference: “clear error” requires a more significant mistake than “mere error.” In addition, a district court’s decision to accept or deny a pro hac vice application is itself reviewed only for abuse of discretion. United States v. Walters, 309 F.3d 589, 591 (9th Cir. 2002). We do not find an abuse of discretion unless the district court committed legal error, or made a factual determination that was illogical, implausible, or without' support in inferences that may be drawn from the record. United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).
We face then a dose of double deference: we review the district court order under the abuse of discretion standard; and we grant mandamus relief in only exceptional circumstances, looking for evidence of clear error. See In re United States, 791 F.3d at 955. There are also pragmatic reasons for deferring to a district court decision denying pro hac vice admission. After all, it is the district court judge, not an appellate panel, that is on the front lines in the courtroom, dealing closely with lawyers and having to do so in a way that ensures the orderly administration of justice.
Yet, even in this highly deferential setting, there are limits on trial court discretion, and there are times when we should act.
Ill
An overriding consideration, in my view, is that a little over three months from now, *1050 Bundy is scheduled to go to trial on sixteen serious federal charges, and may do so without a lawyer of his choice; either without representation at all, or with a different lawyer, not of Bundy’s first choice, who comes into the case so late that there should be concern that the quality of representation may be substantially impaired. The charges against Bundy include conspiracy to commit an offense against the United States, 18 U.S.C. § 371, conspiracy to impede and injure a federal officer, id. § 372, assault on a federal officer, id. § 111 (a)(1) and (b), threatening a federal law enforcement officer, id. § 115(a)(1)(B), use and carry of a firearm in relation to a crime of violence, id. § 924(c), obstruction of the due administration of justice, id. § 1503, interference with interstate commerce by extortion, id. § 1951, and interstate travel in aid of extortion, id. § 1952. If convicted on some or all of the charges, Bundy, who is 70 years old, could spend the rest of his life in prison.
The trial promises tó be especially long and complex. The Superseding Indictment alleges that Bundy led “hundreds of people” in “a massive armed assault.”[1] Along with Bundy, the government seeks to prosecute 18 other individuals involved in that alleged assault, all in one proceeding. This enormous trial effort is the product of a longer-than-two-year investigation that involved government interviews with more than 150 witnesses. The Government ultimately expects to produce about 1.4 terabytes of digital discovery to the defendants. The litigation is sufficiently complicated that the district court designated the proceeding a complex case under the Speedy -Trial Act. See 18 U.S.C. § 3161(h)(7)(B)(ii).
In addition to its size and complexity, the trial effort against Bundy and his cohorts is unusual in that Bundy’s political views, hostile to the United States federal government, Will likely be center-stage. The allegations in the indictment portray Bundy as. being strongly opposed to the federal government and as considering himself involved in a “range war” with federal officials. The Government alleges that Bundy and his Followers communicated with members of anti-government militias, recruiting them to Bundy’s cause. Bundy also allegedly made statements referring to the government’s seizure as “abuse,” and to government agents as “thieves,” among other similar refrains. While Bund/s trial and any potential conviction will not, and must not, be based on politics, it is likely that the evidence at trial will put his controversial political views in the courtroom with him.
The unique circumstances surrounding Bundy’s prosecution bring with them a likelihood of constitutional problems. Like any defendant, Bundy’s Sixth Amendment “right to the counsel of his choice includes the right, to have an out-of-state lawyer admitted pro hac vice.” Walters, 309 ,F.3d at 592 (quotations omitted). While that right, is not. absolute, it may only be abridged to serve a “compelling purpose.” Id. (quotations omitted). We have not specified the factors that a district court must consider in determining what satisfies a compelling purpose for pro hac vice denial. In re United States, 791 F.3d at 957. However, case law on pro hac vice admission indicates that we should evaluate the district court’s exercise of discretion in part based on the particular needs of the party seeking representation.
*1051 In re United States is instructive. There, we held that a district court’s general rule prohibiting the pro hac vice admission of Justice Department attorneys amounted to clear error. Id, at 958. In reaching that conclusion, we emphasized the special needs of the party before thé- court—the United States. See id; (“[A] district court should consider the unique position of the government as a litigant in determining whether to exercise its discretion.” (internal quotation marks omitted)).[2] In United States v. Ensign, a case in which we ultimately affirmed the district court’s pro hac vice denial, we likewise based our decision in part on the particular needs of the party—a criminal defendant who was already well into trial with different counsel at the time of the pro hac vice application. 491 F.3d 1109, 1115 (9th Cir. 2007). That we would give considerable weight to the needs of the party makes sense: whether a purpose for denying pro hac vice admission is “compelling” depends both on the importance of the purpose and the effect of the denial.
Looking to Bundy’s needs and circumstances, both the complexity of the proceeding against him and his controversial political views raise concerns about his ability to retain competent counsel in a timely fashion. With so many defendants, documents, and potential witnesses in the case, only a fraction of the bar nationwide—let alone in Nevada—has the experience and resources necessary to give Bundy a vigorous defense. Out of that fraction of qualified practitioners, there is likely an even smaller proportion that would accept Bundy’s representation. Bun-dy’s anti-government views and high-profile status among those who oppose federal hegemony make the prospect of representing him daunting for many seasoned defense attorneys. It is unsurprising, then, that not only has Bundy sought out-of-state counsel,- but that he -has found himself retaining an attorney with a controversial reputation of his own. It may be the case here that a controversial advocate is the best chance at a competent defense for a controversial defendant.
This point is made stark by the fact that since Klayman’s initial pro hac vice denial on March 31, 2016, Bundy seems to have failed to find suitable replacement trial counsel».- This is so despite Bundy’s impending trial date and Klayman’s second pro hac vice denial. Instead, Bundy is currently represented before the district court by his local counsel, Nevada attorney Joel Hansen, who is by Hansen’s own admission unable to provide Bundy with an adequate defense. Hansen is part of a small Nevada firm lacking the resources to try this massive case. Moreover, Hansen has attempted to withdraw from Bundy’s defense on the ground that he suffers from a spine and neck injury. According to the Government’s representations at oral argument before us, Hansen’s motion has been granted on the condition that Hansen find replacement counsel. Shortly prior to argument, Nevada attorney Bret O. Whipple filed a notice of appearance on Bundy’s behalf, but only for the limited purpose of filing certain pretrial motions. Government counsel stated at argument that Whipple was currently in negotiations with Bundy over his representation. After our oral argument on the mandamus petition, the Government advised us that Whipple entered another appearance on behalf of Bundy, this time “for the purpose of full representation throughout the duration of the trial.” But ■ Klayman responded .that despite this new language from Whipple, Bundy is still considering whether to hire *1052 Whipple and has not paid Whipple any retainer, and that regardless of the additional appearance of Whipple, Klayman’s assistance is still needed by Bundy on the defense team. At this point, I am not confident that Bundy presently has retained counsel adequate to represent him vigorously through trial.
Klayman appears ready and qualified to represent Bundy at trial. He is a former federal prosecutor .with experience litigating high-profile cases. He has worked, in part during his time at Judicial Watch, in bringing lawsuits over significant public policies. See, e.g., Klayman v. Obama, 957 F.Supp.2d 1 (D.D.C. 2013) (challenge to government telephone metadata collection), vacated and remanded, 800 F.3d. 559 (D.C. Cir. 2015). He has almost 40 years of legal experience and is a member in good standing of both the Florida and Washington, D.C. Bars. Though not currently admitted before the district court, Klayman has been in contact with Bundy about this case since around the time of Bundy’s indictment. Klayman presumably faces a much shorter, learning curve than other potential counsel, including, for example, Whipple.
■ Given Klayman’s present familiarity with this case and the difficulties Bundy likely faces in retaining other capable counsel, denying Klayman admission raises troubling concerns about the fairness- of Bundy’s coming trial. The right to counsel clause of the Sixth Amendment “was designed to assure fairness in the adversary criminal process.” Wheat v. United States, 486 U.S. 153, 158, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In the typical choice of counsel case, concerns about fairness are present, but they do not predominate, because missing out on the defendant’s preferred lawyer does not mean missing out on qualified counsel altogether; the normal assumption is that the defendant will be able to retain some other qualified attorney. See id. at 159, 108 S.Ct. 1692. But because of Bundy’s practical and predictable problems finding capable representation in the time remaining before trial, the denial of his chosen counsel risks leaving him without fully qualified counsel. The powerful concerns about fundamental fairness that, animated landmark right-to-counsel (not merely choice-of-counsel) cases like Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), carry particular weight here. If Klaymaris denial of admission results in Bundy going to trial without capable representation, there will be doubts about .the fairness of the proceeding. This risk of fundamental unfairness supports concluding that the district court acted outside the range of its permissible discretion.
I recognize that the ethical concerns of the majority and the district court, particularly their concern whether Klayman has been candid and forthcoming in his representations seeking pro hac vice admission, have some weight. Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate. But then, after the district court discovered his Petition for Negotiated Disposition, he may have come near the line of lack of candor in explaining it away. He stated that the disposition never went into effect because he “later thought the better of having signed the affidavit ... since he feels strongly that he acted ethically at all times.” Yet, what had happened was a D.C. Board on Professional Responsibility Hearing Committee had rejected the disposition as too lenient for the bar’s tastes.[3]
*1053 At oral argument before us, Klayman explained his view of the difference. by saying that after the rejection, he at first ■ continued to negotiate with counsel for the D.C. Bar, but then decided to withdraw from those negotiations. While this shows that Klayman was not lying in his initial explanation, he still seems to have been, at the least, selective in his disclosure's to the district court. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court’s further direct requests. Yet, for him to tell the district court that it was wrong about the negotiated discipline being in effect and to not also tell the court why the disposition lacked effect—its rejection by the bar committee—may have been a relevant omission.
The other concerns raised by the district court in its briefing in this court and its two orders denying Klayman admission, in my view, carry less weight. First, the allegations underlying the D.C. proceeding are unproven, and we cannot know what their resolution will be. The district court held this uncertainty against Klayman, stating in its two orders denying his admission that Klayman would need to show that the proceeding was resolved in his favor before the court would admit him. This approach is contrary to the our legal tradition’s instinct to presume innocence until finding guilt. Of course, the D.C. proceeding involves attorney discipline and not criminal prosecution, but fundamental principles still have weight—at least in terms of evaluating the district court’s exercise of discretion. At this time, Klayman is still a member of the D.C. Bar, and has not been disciplined by its Board on Professional Responsibility. Moreover, Klay-man has submitted a letter from Professor Ronald Rotunda, an expert on legal ethics, expressing the opinion that Klayman’s actions at issue were ethical. This is all the more reason not uncritically to credit unproven bar allegations.
The district court and the majority also point to the two instances of federal judges banning Klayman from their courtrooms. While serious punishments, these orders were issued 22 and 18 years ago. Two decades—half of Klayman’s career—is enough time for the incidents to be relatively poor predictors of Klayman’s likely behavior today. The district court, as well as the New York state court that denied Klayman pro hac vice admission, noted that other judges, even recently, have in their written orders expressed irritation or disapproval of Klayman’s actions. It may be that Klayman is not an attorney whom all district court judges would favor mak *1054 ing an appearance in their courtroom. It seems he has been, and may continue to be, a thorn in the side. Still, concerns about trial judge irritation pale in comparison to a criminal defendant’s need for robust defense. In providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering. In tough cases with skilled prosecutors, aggressive positions by defense lawyers are sometimes an unavoidable part of strong advocacy, and contribute to making the proceeding an ultimately fair one for the defendant.
I do not dismiss lightly the district court’s ethical concerns regarding Klay-man, especially the issue of candor. The district court had good grounds to be worried about Klayman appearing before it. But the need to provide a vigorous defense for Bundy is a superordinate concern. Bundy faces a very complex trial on serious criminal charges and a potential lack of qualified representation. If convicted, he may spend the rest of his life in prison. We cannot evaluate ethical concerns without considering this context. The district court did not fully consider this bigger picture, and did not ensure that Bundy’s need for a vigorous defense was given due weight. In my view, these circumstances should be controlling in our assessment of whether the district court’s decision to deny Klay-man pro hac vice admission was an abuse of discretion and clear error.
I also do not suggest that district courts generally must blink over ethical concerns. At least two other circuits have held that the only thing a district court may consider in pro hac vice admission is whether the out-of-state attorney is guilty of conduct so unethical as to justify disbarment. See In re Evans, 524 F.2d 1004, 1007 (5th Cir. 1975); Schlumberger Techs., Inc. v. Wiley, 113 F.3d 1553, 1561 (11th Cir. 1997). Our circuit, by contrast, permits denial of pro hac vice admission based on a broader standard—one that grants district courts leeway to consider the facts pertinent to the particular case. See In re United States, 791 F.3d at 956 (“We need not announce specific factors that should inform a district court’s exercise of its discretion to deny pro hac vice admission.”). In holding the view that the district court abused its discretion and clearly erred here, I need not suggest that our circuit’s law should be disregarded and should conform with that of the Fifth and Eleventh Circuits. I can agree with the principle reaffirmed in In re United States that in appropriate cases, ethical concerns not meriting disbarment may be sufficient to justify pro hac vice denial. 791 F.3d at 956. But the matter before us is not such an appropriate case. Concerns about Bundy receiving a proper defense to ensure a fair criminal trial in my view should be considered controlling by our panel.
I also emphasize that district courts have available to them many tools short of denying admission that allow them to keep unruly lawyers in check. Through the power of sanctions, and in extreme cases even contempt proceedings, district courts can expect to be able to control a lawyer who is considered by the court to be recalcitrant, tricky, or deceptive, subject to the normal legal standards governing sanctions. At oral argument, Klayman advised us that he would follow all orders issued by the district court regarding the orderly administration of justice, and that he would abide by any other orders of the district court, I accept his representation and expect that if he were admitted and then deviated from it, the district court would be well-equipped through its sanction power to take corrective action.[4]
*1055 I acknowledge that we grant mandamus relief sparingly, particularly in cases challenging the denial of pro hac vice admission. Yet given the number of serious charges Bundy faces, the complexity of his' trial, his likely difficulty in finding other qualified counsel, and Klayman’s own qualifications, I conclude that the district court’s concerns over Klayman’s practice history and candor are outweighed by Bundy’s need for adequate representation in this important and complex case. Based on the unusual facts of this case and the considerations that I have voiced, I would hold that the district court abused its discretion, resulting in clear error. If, as the majority holds, our circuit’s law on abuse of discretion and clear error for mandamus relief requires its conclusion to deny the mandamus petition, then in my view that law stands as a barrier to justice and should be' altered. In an unusual casé such as this, involving a massive federal prosecution of many persons and allegations that their sentiments and alleged criminal conduct were sharply opposed to our federal government, it is particularly important to ensure that target defendants are able to be represented and defended vigorously. There is doubtless some merit to the bright-line views of the Fifth and Eleventh Circuits that a counsel of choice should not be eliminated through the pro hac vice admission process absent an ethical violation that could merit disbarment. But even accepting our circuit’s broader view that ethical problems short of those may be pertinent to a district court’s decision on whether a lawyer should be admitted pro hac vice, there are nonetheless limits on a district court’s exercise of discretion, and I think they are transgressed here.
To give a metaphorical example, we would not need a finely-tuned judicial scale to determine that a district court abused its discretion if it found that a mouse outweighed an elephant. That would be an abuse of discretion, and clear error. And here, even if the purported ethical flaws marshaled by the majority and the district court are beyond “mouse” proportions, they are-still relatively small in this special context, where the. elephant is Bundy’s general entitlement to the counsel of his choice and to a vigorous defense at trial. In my view, concerns about whether at this stage Bundy will have adequate and vigorous representation, absent Klayman, outweigh the ethical concerns that have been expressed by the district court and the majority.
I respectfully dissent.

. While I mention the subject matter of the allegations against Bundy because they are relevant to his ability to retain capable counsel, I express no view on the merits of the underlying case. The merits of the criminal charges are not before us, and I have not reviewed any evidence relating to them.

. Though the United States was not a criminal defendant in Ip. re United States, and so the Sixth Amendment did not apply, the case still supports considering the needs of the party when deciding on pro hac vice admission generally.

. This bar committee rejection for undue leniency does not indicate how the merits of the proceeding will come out. The decision reject *1053 ing the negotiated disposition said that it did not consider certain "potential mitigation” factors that would be considered in determining whether any ultímate violation was "justified.” These potential mitigation factors included that Klayman might not have actually had a conflict in two of the three representations, that he represented two of the individuals because he believed that "they would have no other recourse in their lawsuits,” and that the representations were all performed pro bono. Moreover, a statement of a bar committee in this context is not, in my view, of controlling weight because it is not a final determination of ethical violations. Instead, the committee’s views remain subject to other information it could consider, and the whole matter remains subject to review by the federal Court of Appeals for the D.C. Circuit if a final resolution by the bar association was reached that Klayman appealed.

. The Government made clear at oral argument that it does not challenge Klayman’s representation, does not urge that Klayman not be admitted, and generally suggests that Bundy is entitled to a vigorous defense.